UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BENIHANA, INC., as successor to BENIHANA
NATIONAL CORP.,

                                    Petitioner,

                    -v-

BENIHANA OF TOKYO, LLC, as successor to
BENIHANA OF TOKYO, INC.,

                                    Respondent.

-------------------------------------------------------------------X

15 Civ. 7428 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  7/15/16

PAUL A. ENGELMAYER, District Judge:

Before the Court is a petition by Benihana Inc. ("BI") to confirm in part and vacate in

part an arbitral award, Dkt. 1 ("Petition" or "Pet."), and a cross-petition by respondent Benihana

of Tokyo, LLC ("BOT") to confirm the same award in its entirety, Dkt. 21 ("Cross-Petition").[1]

BOT also seeks sanctions against BI under Federal Rule of Civil Procedure 11, arguing that BI's

petition to partially vacate the arbitral award is frivolous.  Dkt. 32.

The arbitral award ("Award") arises out of BI's termination of a license agreement

("License Agreement") governing BOT's operation of a "Benihana" restaurant in Hawaii, based

on BOT's alleged breaches of the License Agreement governing its conduct as licensee.  The

arbitral panel found that BOT had indeed committed various breaches.  Nevertheless, by a 2-1

---

[1] Although BOT styled its filing as a "cross-motion," the Court construes it as a petition to
confirm, as it meets the notice requirements and requests the relief appropriate for such a
petition.  *See Trustees of N.Y.C. Dist. Council of Carpenters Pension Fund, Welfare Fund,
Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. & Indus. Fund v. All.
Workroom Corp.*, No. 13 Civ. 5096 (KPF), 2013 WL 6498165, at *1 n.1 (S.D.N.Y. Dec. 11,
2013).

vote, the panel overturned BI's termination of the License Agreement.  Construing the License Agreement to permit termination only when reasonable, the majority found the termination here, on balance, not reasonable, citing various factors.  It instead awarded BI the lesser remedy of a permanent injunction against the breaching practices at issue, and attorneys' fees.  In a strongly worded dissent, the third arbitrator contended that BOT's established material breaches necessarily made termination of the license reasonable, and argued that the panel majority's subjective and broad-ranging assessment of reasonableness effectively rewrote the agreement's terms.

BI's petition to vacate the aspect of the panel's ruling finding termination unreasonable presents a closer question than do most challenges to arbitral awards.  The dissenting arbitrator's analysis is far the more persuasive.  Nevertheless, for the following reasons, and largely due to the limited scope of judicial review of arbitral decisions, the Court denies BI's petition to vacate. The Court therefore confirms the Award in its entirety, enters a permanent injunction against BOT's breaching practices as provided by the Award, enters judgment in favor of BI for $1,130,643.80 in attorneys' fees, awards BI reasonable attorneys' fees associated with this Petition in an amount to be determined, and denies BOT's motion for sanctions.

## I.     Background

### A.     Factual Background[2]

---

[2] These facts are drawn principally from the Award, Pet., Ex. 2 ("Award"), the License Agreement, Pet., Ex. 1, the Petition, and the exhibits attached to the various declarations filed by the parties.  *See* Dkt. 17 ("Munn Decl."); Dkt. 23 ("Manson Decl."); Dkt. 28 ("Munn Reply Decl.").  Many exhibits were filed by both parties; the Court, for ease of reference, cites only to one.  In addition, BOT filed, under seal, all joint and individual arbitration hearing exhibits that were presented to the arbitral panel, labeled J-1 through J-9, C-1 through C-106 (BOT's exhibits), and R-1 through R-358 (BI's exhibits).  *See* Manson Decl. ¶ 1.  Unless otherwise specified, the Court refers directly to those exhibits as labeled before the panel.  The Court refers to the transcript of the arbitration proceedings, Munn Decl., Ex. 3 ("Arb. Tr."), by citation to the original page numbers of the transcript.

### 1.    History of Benihana and Key Provisions of the License Agreement

The Benihana enterprise is the brainchild of Hiraoki "Rocky" Aoki.  Award ¶ 1.  It was founded in 1964 by BOT's predecessor, with a restaurant on West 56th Street in Manhattan.  *Id.* The restaurants offer *teppanyaki* cooking, first introduced in the United States by BOT, which "is a style of Japanese cuisine that uses an iron griddle to cook"; Benihana "place[s] an emphasis on the chef performing a show for the diners" while preparing food.  *Id.*  The Honolulu restaurant, at issue here, is located at the Hilton Hawaiian Village.  *Id.* ¶ 2.  It was established in 1971, and constructed from a farmhouse transported from Japan.  *Id.*

In addition to BOT, Rocky also founded BI (a/k/a Benihana America) in 1994.  *Id.* ¶ 3. Although Rocky initially owned and controlled both BOT and BI, BI came to have various outside investors, while BOT has remained controlled by the Aoki family (including through a trust).  Rocky died in 2008.  *Id.* ¶¶ 3–4.

In 1995, BI and BOT (or their predecessor entities) entered into two agreements pertinent here.  The first, an Amended and Restated Agreement and Plan of Reorganization (the "ARA") divided up the rights to operate Benihana restaurants and to use Benihana trademarks, granting BI those rights in the United States, Latin America, and the Caribbean, and BOT those rights for all other territories.  *Id.* ¶ 5 (citing J-1, the "ARA").  The sole exception to that territorial division is Hawaii; the ARA provides that BI would grant BOT a license to continue operating in Hawaii. *Id.*

The second, the License Agreement, controls here.  It gives BOT a perpetual, royalty-free license, subject to its terms, to operate Benihana restaurants in Hawaii.  The Honolulu restaurant is the only such restaurant.  *Id.* ¶¶ 2, 6; License Agreement, Arts. 1.1, 3.4.

In its opening "Whereas" clauses, the License Agreement recites that BI and BOT entered into it "in consideration of the transfer by [BOT] to [BI] of certain assets of [BOT's]

pursuant to" the ARA.  These clauses further recite that BI "has created and developed a unique and distinctive system of high-quality restaurants"; that BI "is the sole and exclusive owner of all proprietary and other property rights and interests in and to certain trade names, service marks, logos, emblems, and indicia of origin, including . . . 'Benihana', 'Benihana of Tokyo', and the 'flower' symbol" (the "Marks"); that BI develops, uses, and controls these Marks "to represent the System's high standards of quality, appearance and service"; and that BOT "acknowledges the importance of [BI's] high standards of quality, cleanliness, appearance and service and the necessity of operating the business franchised hereunder in conformity with [BI's] standards and specifications."  Award ¶ 7; License Agreement at 2–3.

The License Agreement then sets out detailed provisions governing BOT's operation of the Honolulu restaurant and related subjects, including BOT's advertising, food sales, and insurance coverage; BI's rights to terminate the agreement; dispute resolution; and choice of law (New York).  Award ¶¶ 6–9; License Agreement, Arts. 5–8, 12–13, 17.7.

The following provisions are most central here.

Article 5 covers BOT's use of the Benihana service marks and trade names.  It provides that "[a]ny and all advertising, publicity, signs, decorations, furnishings, equipment or other matter employing in any way whatsoever the words 'Benihana', 'Benihana of Tokyo' or the 'flower' symbol shall be submitted to [BI] for its approval prior to publication or use.  [BI] shall not unreasonably withhold approval for any such publication or use."  License Agreement, Art. 5.2.

Article 6 covers BOT's duty "to diligently operate the Restaurants in strict compliance" with the Benihana "System," including "menu selection."  *Id.*, Art. 6.2.  Article 6.3 states that BOT "shall sell or offer for sale only such products and services as have been expressly

4

approved for sale in writing by [BI] (such approval shall not be unreasonably withheld)." *Id.*, Art. 6.3.

Article 8 provides that BOT covenants and agrees "[t]o advertise, sell or offer for sale only those items which are sold by [BI] in its company-owned restaurants or such other products as are approved by [BI] in writing, which shall not be unreasonably withheld, prior to offering the same for sale." *Id.*, Art. 8.1(c). BOT is required to carry comprehensive liability insurance, which names BI as an additional assured. *Id.*, Art. 8(e)(i).

As to defaults, the License Agreement provides that "any failure to comply with the covenants and agreements in this Article 8, or with covenants and agreements in Article 5 hereof with respect to the Marks . . . , shall constitute a *material event of default* under this Agreement." *Id.*, Art. 8.4 (emphasis added). It further provides that any failure to comply with Articles 5 and 8 "would result in irreparable injury to [BI] for which no adequate remedy at law may be available, and, therefore, [BI] shall be entitled, in addition to any other remedies which it may have hereunder, at law or in equity, to obtain specific performance of, or an injunction against the violation of, the requirements of [Article 5 and 8], without the necessity of showing actual or threatened damage." *Id.* In addition, "[BOT] agrees to pay all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by [BI] in connection with enforcement of this Article 8 or of Article 5 provided that [BOT] is determined to be the breaching party." *Id.*, Art. 8.5.

As to BI's right to terminate the License Agreement—central here—Article 12, titled "Default; Termination," lists nine events "the occurrence of [which] shall constitute good cause for [BI], at its option and without prejudice to any other rights or remedies provided for

5

hereunder or by law or equity, to terminate [the License] Agreement." *Id.*, Art. 12.1.  Relevant here, BOT has good cause to terminate:

> (g) If [BOT] violates any [] substantial term or condition of this Agreement and [BOT] fails to cure such violation within thirty (30) days after written notice from [BI] to cure same; [or]
>
> (h) If [BI] gives [] three [] notices of any default hereunder (and such defaults are thereafter cured), within any consecutive twelve [] month period . . . .

*Id*.

The License Agreement provides for the resolution of disputes by arbitration.  In the event of termination, arbitration is mandatory:  "If this Agreement shall be terminated by [BI] and [BOT] shall dispute [BI's] right of termination, or the reasonableness thereof, the dispute shall be settled by arbitration . . . ." *Id.*, Art. 13.1.  As to other disputes, either party can elect arbitration but it is not mandatory and the parties may alternatively seek relief in court.  *Id.*, Art. 13.2.  "Enforcement of any arbitration award, decision or order may be sought in any court of competent jurisdiction." *Id.*  All arbitration between the parties is to be settled by the American Arbitration Association ("AAA") in New York City in accordance with the AAA's rules.  *Id.*, Arts. 13.1–13.2.

### 2.    Breaches, Termination, and Litigation Outside of Arbitration

The arbitral panel considered a number of alleged breaches, by BOT, of the License Agreement.  The Court here summarizes the areas in dispute, and the litigation in this Court regarding some of them on the parties' respective motions for temporary relief pending the outcome of arbitration.

On May 6, 2013, BI notified BOT in writing that BI had learned that BOT was serving hamburgers (called "Beni Burgers") at the Honolulu restaurant.  BI noted that hamburgers were not an authorized menu item and that BOT was required to obtain approval before selling new

6

menu items, and demanded that BOT remove the burgers from the menu.  Award ¶ 10.  On July

30, 2013, BI sent a second letter notifying BOT that it was in breach of the License Agreement

and giving BOT 30 days to cure.  *Id.*  On September 24, 2013, after two extensions of the cure

period, BOT initiated an action in New York State Supreme Court.  BOT sought a temporary

restraining order to extend its time to cure its alleged breaches until after the conclusion of an

arbitration proceeding, which had not yet commenced.  *Id.* ¶ 11.  BI removed that action to this

Court.  *See* 13 Civ. 6766.

On October 1, 2013, in a lengthy bench ruling, this Court denied BOT's application for a

restraining order.  The Court found that BOT, far from showing a likelihood of success on the

merits, was not likely to prevail on the merits, and appeared in breach of multiple provisions of

the License Agreement, including by selling hamburgers out of its Hawaii restaurant.  Award ¶

11; 13 Civ. 6766, Dkt. 10, at 26–36.

After this Court's decision, in an exchange of emails, BOT's counsel represented that

BOT "will not be selling hamburgers in Hawaii."  Award ¶ 11 (internal quotation marks

omitted).  Nevertheless, through February 20, 2014, BOT continued selling hamburgers.  *Id.* ¶

12.  At various times, hamburgers were sold under the names "Beni Burger," "Classic Burger,"

"Tempura Burger," and "Tokyo Burger," as well as a "Beni Panda," a children's dish with rice

and two mini-burgers arranged to resemble a panda's face.  *Id.*

On December 13, 2013, BI notified BOT of more breaches of the License Agreement.

*Id.* ¶ 42.  One set involved BOT's use, without notice to or approval by BI, of various

advertising, signs, and decorations.  *Id.*  These included using images of Keiko Aoki, Rocky's

widow, in advertising, including referring to her as "Ms. Benihana"; using signs outside the

restaurant reading "Benihana of Tokyo" instead of "Benihana"; and using Japanese-language

advertisements without English translation.  *Id.*  BI further notified BOT that it was in breach for failing to give BI its gross sales information and to spend 2% of gross sales on advertising, as the License Agreement required.  *Id.* ¶ 43; *see* License Agreement, Art. 7.2.  BI also notified BOT that it had failed to confirm its compliance with Article 8.1(e)'s insurance requirements.  Award ¶ 42.

On February 5, 2014, BI, having discovered that BOT was continuing to sell hamburgers from the Honolulu restaurant, sent BOT a notice of termination of the License Agreement, effective February 15, 2014.  *Id.* ¶ 13.  BI asserted good cause for termination under Article 12.1 based on both (1) BOT's failure to cure within 30 days and (2) three notices of default within 12 months.  *Id.*

On February 7, 2014, BI filed, in this Court, a petition for a preliminary injunction in aid of arbitration.  It sought to enjoin BOT—pending arbitration, which had by then been initiated— from (1) selling hamburgers and (2) using unauthorized advertisements in violation of the License Agreement.  *Id.* ¶ 14; *see* 14 Civ. 792.  Although BOT had conceded in the earlier injunctive action it had brought that the sale of hamburgers violated the License Agreement, and although it now had voluntarily stopped selling all hamburgers pending arbitration, BOT defended against the preliminary injunction, on the grounds that its later sales of hamburgers did not breach the License Agreement because the sales took place outside the restaurant in a non-exclusive patio area, and because the Beni Panda, in its view, was "not itself a burger" but a "fried rice dish."  Award ¶ 15 (internal quotation marks omitted).

On February 26, 2014, in a bench decision, this Court rejected BOT's arguments.  It found it "clear beyond peradventure that [BI] will succeed on the merits of its claim that the burgers violate the license agreement"; the Court noted that BOT's recidivism supported entry of

a preliminary injunction against further hamburger sales, notwithstanding BOT's voluntary cessation at the time of the Court's decision.  14 Civ. 792, Dkt. 19, at 42–44, 47–50.  The Court also found that BI was likely to succeed on its claims that BOT was violating the License Agreement's advertising provisions based on its unapproved advertisements for the sale of hamburgers, advertisements involving Ms. Aoki, advertisements using the Japanese language, and its restaurant signage.  *Id.* at 53–55; 14 Civ. 792, Dkt. 15 (BI's reply brief), at 7.

On February 26, 2014, this Court granted BI the preliminary injunction it sought.  The Court enjoined BOT from:

> 1.  Selling hamburgers or other unauthorized food items on the premises of, or in any manner in connection with, the Benihana restaurant it operates in Hawaii pursuant to a license from Benihana Inc.
>
> 2.  Using or publishing, in connection with the Benihana restaurant it operates in Hawaii pursuant to a license from Benihana Inc., advertisements, publicity, signs, decorations, furnishings, equipment, or other matter employing in any way whatsoever the words "Benihana," "Benihana of Tokyo," or the "flower" symbol that have not been approved in accordance with Article 5.2 of the License Agreement.

14 Civ. 792, Dkt. 17; *see* Award ¶ 16 (citing the preliminary injunction).[3]

In addition to these alleged breaches, the arbitration panel also considered others that either occurred or were uncovered after the June 2014 arbitration hearing.  *See* Manson Decl., Ex. E ("BI Supplement to Arbitration Counterclaims"), at 4–8.  In June 2014, BI discovered additional breaches through a financial audit and physical inspection of the Honolulu restaurant.

---

[3] This Court also enjoined BOT from "[a]rguing to the arbitration panel, in the event the panel rules that it breached the License Agreement so as to justify its termination, that it should be permitted to cure any defaults."  14 Civ. 792, Dkt. 17.  BOT appealed this Court's preliminary injunction.  The Second Circuit upheld all aspects of the preliminary injunction except for the portion that barred BOT from asking to have the arbitral panel extend its cure period, finding that the broad language of the License Agreement's arbitration provisions committed that issue to the arbitral panel to resolve.  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895–902 (2d Cir. 2015).

Award ¶ 57.  These included: (1) "[u]napproved advertisements in print publications and on the Hilton Hotel Village hotel channel;" (2) "[u]se of non-standard, lower-quality ingredients and deviating from standard recipes;" (3) "[f]ailure to carry adequate liability insurance and name [BI] as an additional assured;" and (4) "[p]ermitting a third-party vendor to operate within the [] restaurant to sell photos to customers, rather than offering them for free."  *Id.* ¶ 58.  Also, in July 2014, to commemorate the 50th anniversary of Benihana restaurants, BOT launched a "Beni Girls" advertising campaign, featuring a two-woman hip-hop dance group that performed at the restaurant from July 14–19, 2014, and whose performances were promoted on a Honolulu morning talk show.  *Id.* ¶ 49.  BOT did not seek or obtain BI's prior approval for the Beni Girls campaign.  *Id.* ¶ 53.

### B.     Arbitration

#### 1.     Procedural History

On January 13, 2014, BOT commenced an arbitration proceeding before the AAA in New York City.  It sought a declaration that it was not in default under the License Agreement. Award ¶ 17; Munn Decl., Ex. 16 ("BOT Arbitration Demand").  On February 5, 2014, BI filed a counterclaim seeking an award affirming its decision to terminate the License Agreement on account of BOT's defaults, and seeking "an award of all damages, fees, costs, and other remedies available under the License Agreement and at law and equity."  Award ¶ 17 (internal quotation marks omitted); Munn Decl., Ex. 18 ("BI Arbitration Counterclaims").  Pursuant to the arbitration provisions in the License Agreement, BOT and BI each appointed an arbitrator, and the two party-appointed arbitrators selected a third arbitrator to serve as the chair of the panel. Award ¶ 18.

The panel held hearings on June 2–5, 2015 in New York City, at which the panel heard witness testimony, and the parties submitted exhibits.  *Id.* ¶ 26.  On June 10, 2015, the panel

issued an order giving BOT until June 15 to supplement the record on particular issues, and set deadlines of July 9, 2015 and July 30, 2015 for post-hearing memoranda and reply memoranda respectively, deadlines the parties met.  *Id.* ¶¶ 28, 30.

### 2.    The Award

On September 18, 2015, the panel, ruling by a 2-1 vote, issued the Award.[4]  In its 32-page Award, the panel made extensive findings of fact, including that BOT had committed several material breaches of the License Agreement.  However, the panel read Article 13.1 of the Agreement to authorize termination only where there was both a right to terminate and where termination was "reasonable."  BI's termination, the panel held, was not reasonable, making termination unjustified.

The Award began by noting the panel's jurisdiction to resolve all disputes arising out of BOT's operation of the Honolulu restaurant.  *Id.* ¶ 25.  It then addressed BOT's alleged breaches of the agreement, and whether the breaches found were "material."[5]  The Award found three material breaches.  Two involved BOT's sale and advertisement of hamburgers.  Award ¶¶ 68–71.  This conduct, the Award held, breached BOT's covenant and agreement "[t]o advertise, sell or offer for sale only those items" approved by BI prior to offering them for sale, *id.* ¶ 69 (quoting License Agreement, Art. 8.1(c)) (internal quotation marks omitted), and together constituted "multiple material events of default," *id.* ¶ 71 (citing License Agreement, Art. 8.4 (failure to comply with covenants and agreements under Articles 5 and 8 is material event of default)).  Separately, the Award found BOT's failure to name BI as an additional assured, as required by Article 8.1(e)(i), was a material event of default.  *Id.* ¶ 59.

---

[4] References to the "Award" or the "panel" refer to the majority decision.

[5] The panel's determinations as to whether the various alleged breaches were material are scattered across the Award's Findings of Fact and its Conclusions of Law.

The Award found no other material breaches.  While BI had not approved BOT's Beni Girls advertising campaign as was required, *see id.* ¶ 53, that campaign, the Award found, was not "detrimental to the Benihana image," *id.* ¶ 56.  And the other "asserted violations" identified in BI's audit were also not material: to wit, BOT's unapproved advertisements; its use of non-standard, lower quality ingredients and deviation from standard recipes; and its having allowed third-party vendors to sell photographs.  *Id.* ¶ 59; *see also id.* ¶ 61 ("[W]ith the exception of the hamburger advertisements, which have been discontinued, none of the other advertising is a material breach of the License Agreement.").[6]

Having found the three material breaches, the Award then found that BOT's failure to cure gave BI, under Article 12.1, "good cause" for terminating the License Agreement.  *Id.* ¶¶ 72–78.  As to the hamburger sales, the Award—while stating that "many high-end restaurants serve hamburgers" and that "[o]n a superficial level, the addition of a hamburger, which is a popular menu item at a beach-side restaurant, would seem to be a trivial violation"—noted that BI had had reason to withhold approval for hamburger sales as inconsistent with the restaurant's image.  *Id.* ¶ 76; *see also id.* ¶¶ 73–74.  And BOT had continued to sell and advertise hamburgers after the cure period.  *Id.* ¶ 76.  The Award rejected BOT's claim that that breach was excused by the fact that BI, before its ownership changed in 2012, had tolerated certain breaches of the agreement.  *Id.* ¶ 77.  And, the Award noted, "forbidding the sale of hamburgers is a rational decision for business like [BI]" insofar as hamburgers might present health risks.  *Id.*  Separately, the Award found, BOT's failure to add BI as an additional assured was a material breach which had gone uncured.  *Id.* ¶ 78.

---

[6] The Award seems to imply that this conduct breached the agreement (albeit not materially), but is not express on that point.

The Award held that BOT's defenses to the material breaches failed as a matter of law. *Id.* ¶¶ 79–84 (rejecting defenses that BI had waived its ability to enforce those provisions and that BOT's breaches were excused by breaches by BI).

In the panel's analysis, however, these findings did not dictate the conclusion that termination was reasonable. As the Award construed the License Agreement, the existence of "'good cause' to terminate" does not "alone justify termination." *Id.* ¶ 85. Rather, the panel read Article 13.1, "an unusual provision," to require a panel considering whether termination was justified to make two distinct inquiries: whether BI had a right to terminate, and, if so, whether termination was reasonable. *Id.* (quoting License Agreement, Art. 13.1) ("If this Agreement shall be terminated by [BI] and [BOT] shall dispute [BI's] right of termination, ***or the reasonableness thereof***, the dispute shall be settled by arbitration . . . ." (emphasis in Award) (internal quotation marks and alteration omitted)). "Thus," the Award stated, "no matter the magnitude of any breach, [BI's] termination of the License Agreement must also be found reasonable by the arbitrators, if [BOT], as here, contests the reasonableness of the termination." *Id.* As support for its view that, under Article 13.1, it was required to make a stand-alone inquiry into reasonableness, the Award cited principles of contract interpretation in New York that require "an interpretation [to] give[] meaning to every provision of the contract." *Id.* ¶ 86 (quoting *Paneccasio v. Unisource, Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008)) (internal quotation mark omitted). The Award rejected BI's alternative construction, under which the reasonableness clause would be read to require only that BI's termination was in good faith, explaining that "a 'good faith' standard is already part of the License Agreement by operation of law." *Id.* ¶ 87; *see id.* ¶¶ 86–87.

The Award then defined the "reasonableness" test.  Applying the ordinary meaning of that word, it held that the termination must be "fair, proper, or moderate under the circumstances; sensible."  *Id.* ¶ 88 (quoting Black's Law Dictionary (10th ed. 2014)) (internal quotation marks omitted).

BI's termination, the Award held, did not meet that standard.  It found that BI's strongest basis for termination had been BOT's "persistent refusal . . . to cure material violations of the License Agreement . . . [after] receiv[ing] multiple notices of violations, committ[ing] (through counsel) to stop selling hamburgers, and nonetheless continu[ing] [to] sell[] hamburgers."  *Id.* ¶ 90.  But, the Award stated, after the cure period had ended and after this Court had refused to extend it, BOT had taken what it "believed were corrective measures," including moving the hamburger sales outdoors and renaming the burger to strike the word "Beni."  *Id.* ¶ 91.  To be sure, the Award noted, these measures "badly misinterpreted" this Court's reasoning in rejecting BOT's application for preliminary relief, and broke BOT's own counsel's promise to BI that BOT would not sell hamburgers.  *Id.*  But, the Award stated, these represented a change in "the way [BOT] did business in response to the end of the cure period."  *Id.*  Further, while the sale of hamburgers was "a continuing breach, . . . it only lasted four months and there was no evidence that it harmed the brand in any way."  *Id.*  In so ruling, the panel acknowledged BI's expert's testimony that a franchisee's sale of unauthorized food items is harmful *per se*, but it reiterated that there was no evidence that BI had in fact suffered damage to the brand.  *Id.* ¶ 91 n.11.

As to the separate material breach relating to liability insurance, the panel found the failure to add BI as an additional assured did not make termination reasonable, both because BOT had "maintained an appropriate amount of insurance at all times," and because "if [BI]

14

were named in a lawsuit, so would [BOT], and the defense and indemnity would properly be tendered to the carrier." *Id.* ¶ 92.

Continuing its assessment of reasonableness, the Award then considered the termination in light of what it called the "two essential purposes of the License Agreement." *Id.* ¶ 94. First, it stated, "the perpetual, royalty-free nature of the license here is strong indication that one of the essential purposes of the License Agreement was to keep the Honolulu restaurant, built by Rock[y] Aoki, in the Aoki family." *Id.* ¶ 93. On the other hand, "[BOT's] compliance with its obligations under the License Agreement . . . is the *quid pro quo* for this perpetual royalty-free license[,] . . . [and u]ltimately, [BI] is entitled to dictate menu items and standards to [BOT] and not the other way around." *Id.*

Balancing these two factors, the Award concluded held that "a remedy other than termination is reasonable (*i.e.* fair) under all of the facts and circumstances." *Id.* ¶ 94. These circumstances included the possibility that termination of the License Agreement might lead BOT to lose its lease to operate even a non-Benihana branded restaurant, which, the Award stated, "would simply be too harsh a penalty." *Id.* ¶ 100; *see id.* ¶¶ 99–100.[7]

The alternative remedy the panel chose was a permanent injunction against the breaching practices at issue. The Award found that "it is reasonable and equitable to . . . permanently enjoin [BOT] from selling unauthorized food items and from publishing any advertisements that

---

[7] The Award noted that "[t]he License Agreement does not contain a post-termination non-complete clause, and does not preclude [BOT] from operating a *teppanyaki* restaurant that does not utilize or infringe upon [BI's] trademarks or trade dress." Award ¶ 64. However, BOT's lease with Hilton specified that the "permitted use" was for the operation of a "*Benihana* Japanese-style teppanyaki restaurant." *Id.* ¶ 100 (emphasis omitted) (internal quotation marks omitted). The panel, which had earlier found the evidence "inconclusive" as to whether BOT would lose the lease if it could not operate with the Benihana brand, noted that termination would put the lease "at risk." *Id.* ¶ 100 n.12; *see id.* ¶ 65.

are not approved by [BI]." *Id.* ¶ 97.[8]  Such an injunction, the Award stated, "will restore the relationship [between BI and BOT] to one that reflects the License Agreement's essential purposes." *Id.* ¶ 98.  In support of this outcome, the panel further observed that, as of the date of the Award, BOT appeared to be "compliant" with this Court's preliminary injunction, as evidenced by BI's not having filed a motion for contempt.  *Id.*

As to monetary relief, the Award held, BI was not entitled to trademark damages concerning the Honolulu restaurant.  *Id.* ¶ 101.  But the panel did award BI reasonable attorneys' fees (subject to certain deductions and reductions).  The Award explained that BI was entitled to such fees, under Article 8.5 of the agreement, because BOT was the "breaching party."  *Id.* ¶ 108 (internal quotation marks omitted); *see id.* ¶¶103–17.  The panel did not award BI its costs incurred in the arbitration.  *Id.* ¶ 121.

In a 12-page dissenting opinion ("Dissent"), arbitrator James Cecchi concluded that BI's termination of the License Agreement had been justified by BOT's commission of multiple material events of default.  Cecchi noted that, under established New York law, a non-breaching party may terminate a contract where the other party committed a material breach.  Dissent ¶ 2 (collecting cases).  Therefore, "the panel's findings that [BOT]'s repeated breaches of the License Agreement were material, standing alone[,] make [BI]'s termination of [it] reasonable," *id.* ¶ 3, and the panel's conclusion that "[BOT]'s breaches are serious enough to be material but not serious enough to warrant termination of the License Agreement is internally contradictory," *id.* ¶ 7; *see also* ¶¶ 5, 11–12.  Cecchi added:  "The logical result of the majority's determination

---

[8] As authority for its ability to fashion a lesser remedy that it found just and equitable, the panel cited both the AAA Commercial Arbitration Rules and Mediation Procedures, which governed the dispute, and New York caselaw.  Award ¶¶ 95–96.

is that termination was appropriate and reasonable, a conclusion the majority skirted through . . . *ad hoc* industrial justice which is not rooted in the agreement or the law." *Id.* ¶ 1.

Turning to the factors the panel considered in its reasonableness analysis, Cecchi argued that the panel had downplayed BOT's breaches. "It is hard to conjure up a more serious breach of what is essentially a franchise restaurant," he stated, than the "repeated, intentional and continuous" sales of unapproved menu items. *Id.* ¶ 8; *see also id.* ¶ 7 (BOT's sales of unauthorized menu items and unauthorized advertisements went "to the root of the Agreement between the parties" and were not "technical or trivial breaches"), ¶¶ 20–26 (discussing sale of hamburgers and the unapproved Beni Girls campaign). And the majority's "posit[ing]" that "the purpose of the agreement was to allow the Aoki family to maintain perpetual control over the Honolulu Benihana, irrespective of its adherence to the brand standards," was unsupported by the agreement. *Id.* ¶ 5. Had this been the agreement's primary concern, Cecchi argued, the agreement "would not have contained the provisions requiring [BOT] to maintain the standards set by [BI], and to seek approval of [BI] for promotions and advertising, the very provisions in issue here." *Id.* Finally, Cecchi stated, the panel's finding that termination would be "unduly harsh" because BOT might lose its lease was "neither relevant nor grounded in the facts." *Id.* ¶¶ 9–10. To the extent the Award relied on the potential harm to BOT, from the perspective of equity, Cecchi noted, BOT had unclean hands and had itself put its lease at risk by deliberately flouting the License Agreement, such that the principle that "equity abhors a forfeiture" was inapplicable. *Id.* ¶¶ 13–19. In finding termination unreasonable, he argued, the Award "simply encourages such flouting of the License Agreement in the future," and, "as a practical matter, . . . take[s] termination of the License Agreement off the table as a remedy." *Id.* ¶ 27.

### C.      Procedural History of This Action

On September 18, 2015, BI filed the Petition, seeking partial confirmation and partial

vacatur of the Award.  It asked that the Court (1) confirm the Award's grant of $1,130,643.80 in

attorneys' fees, and (2) vacate the part of the Award that had denied termination of the License

Agreement and had allowed BOT to continue operating the Honolulu restaurant.  Pet. at 14.  On

October 27, 2015, BI filed a memorandum of law in support of the petition, Dkt. 16 ("BI Br."),

and a declaration with accompanying exhibits, Munn Decl.

On November 20, 2015, BOT filed a cross-petition to confirm the Award, Dkt. 21, along

with a memorandum of law supporting its petition and opposing BI's petition to partially vacate

the Award, Dkt. 22 ("BOT Br."), as well as a declaration, with exhibits, Manson Decl; *see also*

Dkts. 24–25.

On December 4, 2015, BI filed a reply in support of its petition, Dkt. 27 ("BI Reply Br."),

along with a declaration with additional exhibits attached, Munn Reply Decl.

On January 4, 2016, BOT filed a motion for sanctions against BI under Rule 11, Dkt. 32,

along with a memorandum of law in support, Dkt. 33 ("BOT Rule 11 Br."), and a declaration,

Dkt. 34 ("Manson Rule 11 Decl."), with exhibits attached.  On January 15, 2016, BI filed a

memorandum of law in opposition.  Dkt. 36 ("BI Rule 11 Br.").

On January 20, 2016, the Court held argument regarding BI's petition and BOT's cross-

petition. 14 Civ. 792, Dkt. 45 ("Tr.").  The Court simultaneously heard argument in a related

case, in which BI sought sanctions against BOT for its alleged violations of this Court's

preliminary injunction.  *See* 14 Civ. 792, Dkt. 33.  After argument, the Court invited

supplemental briefing as to the scope of its authority to impose sanctions for violations of the

preliminary injunction, and, if confirmed, the Award's permanent injunction.  Dkt. 37.  On

February 5, 2016, BI filed its supplemental memorandum of law, Dkt. 40 ("BI Supp. Br."), along

with a declaration, Dkt. 41 ("Munn Supp. Decl."), with exhibits attached.  On February 17, 2016, BOT filed a supplemental memorandum of law, 14 Civ. 792, Dkt. 47 ("BOT Supp. Br."), along with a declaration, 14 Civ. 792, Dkt. 48 ("Manson Supp. Decl."), with exhibits attached.[9]

## II.   Confirmation of the Arbitral Award

The only part of the Award in dispute on the parties' competing petitions is its ruling that BI's termination of the License Agreement was unreasonable.[10]  BI argues that that part of the Award should be vacated because it exceeded the panel's powers, reflected manifest disregard for the law, and violated BI's due process rights.  BOT, seeking confirmation of the Award in full, defends that ruling as within the broad scope of the arbitrators' authority.

### A.   Applicable Legal Standards

In seeking to void the panel's ruling, BI faces an imposing standard of review.

Under the FAA, a district court reviewing an arbitral award "can confirm and/or vacate the award, either in whole or in part."  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).  But judicial review of arbitral awards is "severely limited, so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (internal quotation marks and citations omitted).  A reviewing court owes "strong deference" to "arbitral awards and the arbitral process," *Porzig v. Dresdner, Kleinwort, Benson,*

---

[9] BOT's submissions were filed only on the docket of the related case involving the preliminary injunction.

[10] The parties do not dispute that the panel had authority to resolve the issues it resolved.  *See* Award ¶ 25.  BOT, in seeking wholesale confirmation of the Award, does not seek to disturb the panel's findings that it breached the agreement or the panel's chosen relief—awarding BI a permanent injunction and attorneys' fees.  And BI, although disputing that the panel should have imposed a permanent injunction as an alternative to termination, does not challenge the panel's authority to issue it, but rather seeks to render it moot by having this Court approve BI's termination of the License Agreement.  *See* BI Br. 25.

*N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007), and so a party seeking to vacate an arbitral award "must clear a high hurdle," *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

"It is not enough for petitioners to show that the panel committed an error—or even a serious error." *Id.* Rather, under the FAA, "[i]f there is 'even a barely colorable justification for the outcome reached,' the court must confirm the arbitration award." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13 (2d Cir. 1997) (quoting *Matter of Andros Compania Maritima, S.A.*, 579 F.2d 691, 704 (2d Cir. 1978)). Courts have authority to vacate arbitral awards only in certain narrow, enumerated circumstances, such as "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).

Second Circuit cases have held that an arbitral award may also be vacated if it "exhibits a 'manifest disregard' of the law." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 91 (2d Cir. 2008), *rev'd and remanded on other grounds*, 559 U.S. 662 (2010). But the manifest disregard standard, rather than substantially broadening the grounds for vacatur, largely operates "as a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA." *Id.* at 94–95. Vacatur of an arbitral award for manifest disregard of the law "is a doctrine of last resort," reserved for "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent but where none of the provisions of the FAA apply." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003). Manifest disregard of the law "means more than error or misunderstanding with respect to the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986). It applies where: (1) "the law that was allegedly ignored was clear, and in fact explicitly applicable

to the matter before the arbitrators," (2) "the law was in fact improperly applied, leading to an erroneous outcome," and (3) "the arbitrator . . . kn[ew] of its existence, and its applicability to the problem before him." *Duferco*, 333 F.3d. at 390.

This case calls for application of these principles in the context of a contract dispute. In such cases, the Supreme Court has instructed, "[i]t is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." *Stolt-Nielsen*, 559 U.S. at 671 (alterations, citations, and internal quotation marks omitted). Courts "are required to confirm arbitration awards despite 'serious reservations about the soundness of the arbitrator's reading of th[e] contract.' 'Whether the arbitrators misconstrued a contract is not open to judicial review.'" *Stolt-Nielsen*, 548 F.3d at 92 (alteration in original) (quoting *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 216 n.10 (2d Cir. 2002) and *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 203 n.4 (1956)) (internal citation omitted).

As to the "manifest disregard" standard, in such cases, the Second Circuit has "appl[ied] a notion of 'manifest disregard' to the terms of the agreement analogous to that employed in the context of manifest disregard of the law." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d Cir. 1997); *see id.* ("We will overturn an award where the arbitrator merely 'mak[es] the right noises—noises of contract interpretation—' while ignoring the clear meaning of contract terms." (quoting *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 94 (2d Cir. 1988))). "[V]acatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." *Westerbeke*, 304 F.3d at 222. Although an award may be vacated for manifest disregard of the

law, the Second Circuit does not "recognize manifest disregard of the *evidence* as proper ground

for vacating an arbitrator's award."  *Stolt-Nielsen*, 548 F.3d at 91 (emphasis in original) (quoting

*Wallace v. Buttar*, 378 F.3d 182, 193 (2d Cir. 2004)).

Separately, under the FAA, an arbitral award may be vacated where "the arbitrators were

guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy."

9 U.S.C. § 10(a)(3).  A court may vacate an award under this provision "only if 'fundamental

fairness is violated.'"  *Nat'l Football League Mgmt. Council v. Nat'l Football League Players

Ass'n*, 820 F.3d 527, 545 (2d Cir. 2016) ("*NFL*") (quoting *Tempo Shain Corp. v. Bertek, Inc.*,

120 F.3d 16, 20 (2d Cir. 1997)).

### B.      Discussion

In challenging the panel's ruling on termination, BI, importantly, does not challenge its

construction of the key License Agreement provision, Article 13.1.  All three arbitrators

construed that provision—which mandates arbitration where BOT disputes BI's "right of

termination, or the reasonableness thereof"—to require the panel to make separate inquiries into

(1) whether BI had a basis to terminate under the agreement; and, if so, (2) whether BI's

termination decision was "reasonable" (which the panel construed, based on its ordinary

meaning, to mean "fair").  That construction is beyond the scope of judicial review.[11]

---

[11] Under FAA § 10(a)(4), judicial review "focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue."  *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997); *see also Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013) ("[T]he sole question . . . is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong.").  In construing Article 13.1 to require a separate inquiry into the reasonableness of BI's termination decision, the panel here drew upon that Article's text (which recites, in the disjunctive, the phrases "right to terminate" and "the reasonableness thereof"), and principles of contract interpretation under New York caselaw (which provides that terms whose meaning is disputed should be given their ordinary meaning, and that contracts be interpreted so as not to render provisions meaningless).  Award ¶ 86 (citing *Paneccasio*, 532 F.3d at 111; *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 6 N.Y.S.3d

BI's argument is instead that the panel misapplied the second inquiry, into whether BI's termination decision was reasonable.  BI argues that, in finding that it was not, the panel conducted a freewheeling assessment of reasonableness, rife with fundamental errors, that effectively overrode other parts of—and thereby rewrote—the License Agreement.  *See, e.g.*, BI Br. 8 (citing *Katz v. Feinberg*, 167 F. Supp. 2d 556, 572 (S.D.N.Y. 2001) (arbitrator "exceeds the scope of its authority when it modifies, rewrites, or holds contrary to clear and unambiguous contractual language" (internal quotation marks and citation omitted)) and *Collins & Aikman Floor Coverings Corp. v. Froehlich*, 736 F. Supp. 480, 484 (S.D.N.Y. 1990) ("An arbitrator cannot re-write a new agreement for the parties.")).  As such, BI argues, the panel's finding of unreasonableness was compromised and in excess of its authority.  *See, e.g.*, BI Reply 8 (panel's errors were "baked into its determination of reasonableness").

The Court assesses, separately, each of BI's claims of error, inquiring as to each whether the panel's analysis "stray[ed] from interpretation and application of the agreement," *Stolt-Nielsen*, 559 U.S. at 671 (citation omitted), "ignor[ed] the clear meaning of contract terms," *Yusuf*, 126 F.3d at 25, "contradict[ed] an express and unambiguous term of the contract," or "so far depart[ed] from the terms of the agreement that [the Award] is not even arguably derived from the contract," *Westerbeke*, 304 F.3d at 222.

### 1.   The Panel's Consideration of the License Agreement's "Essential Purpose" and of the Possible Consequences for BOT of Termination

BI argues that, for several reasons, the panel exceeded its authority by considering, in its inquiry into whether termination was reasonable, (1) what it found was an "essential purpose" of

---

7, 11 (1st Dep't 2015)); *see also Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (under New York law, "words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." (alteration, internal quotation marks, and citation omitted)).  No caselaw precluded the panel's construction.

the License Agreement—to keep the Honolulu restaurant in the Aoki family—and (2) the possible consequences for BOT of termination.

> a.    The *"essential purpose"* of keeping the Aoki family in control

BI argues that the panel was wrong to find that an "essential purpose" of the License Agreement was to keep the Honolulu restaurant in the Aoki family.

As BI notes, no provision in the License Agreement says this, while the agreement's "Whereas" clauses overtly recognize other objectives as important, including to assure compliance with BI's standards and specifications.  BI Br. 6–7.  Further, as BI notes, other provisions of the License Agreement—most notably, those contemplating the possibility of BOT's transfer of the license to an unaffiliated third party—undermine the premise that the signatories expected BOT, inexorably, to hold the license.  *Id.* at 7 (citing License Agreement, Art. 3.2(a)).

Of central importance, however, given the limited standard of review of arbitral rulings in contract cases, the panel anchored its finding in inferences drawn from the License Agreement. The Award stated that "the perpetual, royalty-free nature of the license here"—a highly unusual arrangement for a franchisee—"is *strong indication* that one of the essential purposes of the License Agreement was to keep the Honolulu restaurant, built by Rock[y] Aoki, in the Aoki family."  Award ¶ 93 (emphasis added).  As a matter of history and contract, BOT was therefore no ordinary franchisee—it was the original owner of the Benihana enterprise, given a license to operate in Hawaii as part of an overall set of agreements that allocated worldwide rights and responsibilities as between it and BI.  *See* ARA, Art. I, § 1.01(d); License Agreement, Art. 1.1.

The panel's inference that the parties to the License Agreement anticipated the Aoki family's continuing and long-term ownership of the Honolulu restaurant, therefore, had an anchor in, and "dr[ew] its essence from," the agreement.  *Eastern Associated Coal Corp. v. Mine*

24

*Workers*, 531 U.S. 57, 62 (2000).  As such, the panel's conclusion to this effect was within its purview.

To be sure, the Award's rhetoric to capture this conclusion was regrettably strong:  Its repeated use of the word "essential" could be misread (as BI does) to imply that the goal of keeping the Aoki family in charge of the restaurant was of such surpassing importance as always to trump all competing factors in considering the reasonableness of termination, making BOT effectively immune from termination regardless of its breaches or their severity.[12]

However, when the Award is read in totality, it is clear that the panel majority did not read the agreement to assign preclusive importance to keeping the Honolulu restaurant in the Aoki family.  On the contrary, the Award stated that it was balancing that factor against those that favored termination, "under all of the facts and circumstances."  Award ¶ 94; *see id.* ¶¶ 89–100 (conducting the overall balancing analysis).  Notably, too, the panel referred to keeping the restaurant in the Aoki family as "one of" the essential purposes of the agreement, never as *the* essential purpose.  *Id.* ¶ 93.

Its inopportune choice of words aside, the panel majority's conclusion that keeping the Honolulu restaurant in the Aoki family was a purpose of the License Agreement was, therefore, based upon, and within its broad authority to construe, the agreement.  This conclusion is beyond the scope of the Court's review.  *See Westerbeke*, 304 F.3d at 213 ("The arbitrator's factual findings and contractual interpretation are not subject to judicial challenge.").  BI's critique of this component of the analysis in the Award does not supply a basis for vacatur.

---

[12] The License Agreement does not support such an inference—and its provisions anticipating the possibility of termination, *see* License Agreement, Art. 12.1, and of successor licensees, *see id.*, Art. 3.2(a), refute it.

b.      *The potential consequences for BOT of termination*

BI next challenges the panel's consideration of the potential consequences for BOT of terminating of the License Agreement.  BI makes two arguments.

First, BI argues, the factual premise that termination would put BOT's lease at risk, and, were the lease lost, would "undoubtedly harm" BOT because the Honolulu restaurant was a significant source of its income, were unsupported by the evidence.  *See* BI Br. 14 (panel relied "on total speculation").  As to the lease, BI notes that BOT's president testified only that "maybe" the Hilton could terminate it if BOT lost the Benihana license, and that Ms. Aoki testified that "yes," she could open another *teppanyaki* restaurant in the same space, but she said, "I don't want to."  *Id.* (quoting Arb. Tr. 254–55, 575) (internal quotation marks and emphasis in brief omitted); *see also id.* (noting that while the "permitted use" of the lease is to operate a "*Benihana Japanese-style* teppanyaki restaurant," the Restaurant Rider does not mention Benihana specifically, and requires only a "Japanese – style Teppan Yaki restaurant including sushi and other Japanese style food items" (internal quotation marks omitted)).  As to the harm to BOT after termination, the panel relied on BOT's data that the restaurant had accounted for some 38–44% of its gross revenue, and 62–75% of its net income, between 2011 and 2014.  Award ¶ 67.  BI, however, dismisses these as "nonsensical and incomplete financial documents," and argues that the panel, in anticipating such harm to BOT, failed to consider that, after termination, BOT could still operate a non-Benihana branded *teppanyaki* restaurant in the same venue, and that BOT's worldwide franchise rights constituted another significant source of revenue.  BI Br. 15–16 (citing testimony that BOT's worldwide franchise rights were worth tens of millions of dollars).

BI's critiques of these factual findings as largely speculative or against the weight of the evidence have force.  On appellate review of a bench verdict, they might support a finding of

clear error.  But in the context of a challenge to vacate an arbitral ruling, "federal courts may not review [findings of fact] even for manifest disregard."  *See Stolt-Nielsen*, 548 F.3d at 98; *see also United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 39 (1987) ("No dishonesty is alleged; only improvident, even silly, factfinding is claimed.  This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the [] facts."); *In re S.E. Atl. Shipping Ltd.*, 356 F.2d 189, 191–92 (2d Cir. 1966) ("Under our limited scope of review of arbitration awards, we are bound by the arbitrators' factual findings and by their interpretation of the contract . . . .").  However meritorious, BI's claim of factual error cannot support vacatur.

Second, BI argues, the panel manifestly disregarded principles of equity recognized by New York caselaw by considering the potential harm to BOT, because the termination and the ensuing consequences to BOT would result from BOT's breaches.  *See* BI Br. 16–17 ("It 'would be a perversion of equitable principles to relieve a party of the impact of its intentional default.'" (quoting *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 579 (1979)); *see also id.* (citing Dissent ¶¶ 15, 19 (making same argument, and related argument that BOT had unclean hands)).  Relatedly, BI argues, the Award gives BOT a perverse incentive to "manufacture" consequences that would help it to claim harm and impede approval of a termination decision in the event of future breaches.  For example, BI surmises, BOT might enter into a lease or other business arrangement whose success depended on BOT's continued operation of the Honolulu restaurant under the Benihana brand, enabling BOT to bootstrap a defense that termination would be unreasonably harmful.  *Id.* at 16.

As to this critique of the panel's analysis, too, BI's argument has force.  But this aspect of the Award, however debatable it is, does not rise to the level of manifest disregard of the law, so as to justify vacatur.

To establish manifest disregard, a party must show that (1) "the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators," (2) "that the law was in fact improperly applied, leading to an erroneous outcome," and (3) "the arbitrator . . . kn[ew] of its existence, and its applicability to the problem before him."  *Duferco*, 333 F.3d. at 390.  Here, the law at issue consists of general principles of equity.  And BI falls short of showing either that the panel "ignored" these principles where their application was clear, or that this misapplication "le[d] to an erroneous outcome."  To begin with, the panel's consideration of the impact of termination was not exclusively—and perhaps not at all—an application of equity. While using the language of equity at times, the panel considered that factor in applying contract language—the License Agreement's "reasonableness" term.  *See* Award ¶ 99 ("Termination of the License agreement would also be *unreasonable* because it could not only lead to the loss of the license, but potentially a loss of a lease to a unique property . . . ." (emphasis added)); *but see id. ¶ 97* (in fashioning remedy, stating that "it is reasonable *and equitable* to—instead of termination of the License Agreement—permanently enjoin" BOT's violating behavior (emphasis added)).  Second, the panel's decision leaves unclear whether this equitable principle, properly applied, would have led it to a different outcome.  The potential harm to BOT was only one of several reasons the panel gave for finding termination unreasonable.  And a panel applying equitable principles would have flexibility as to how to apply them.  *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945) ("[T]he equitable maxim that 'he who comes into equity must come with clean hands[]' . . . necessarily gives wide

range to the equity court's use of discretion . . . ."). Here, for example, the panel factually found that BOT had made an effort (albeit inadequate) to alter its behavior after this Court denied it preliminary relief. Award ¶ 91. Applying equitable principles to the termination decision, the panel here might have found that these efforts offset any finding of unclean hands.

On the record at hand, questionable though the panel's analysis on this point was, the Court therefore cannot find manifest disregard for these equitable principles. *See Westerbeke*, 304 F.3d at 213 ("Under the manifest disregard standard, . . . the governing law must clearly apply to the facts of the case, *as those facts have been determined by the arbitrator*." (emphasis in original)). The panel's consideration of the adverse consequences to BOT as a result of the termination of the License Agreement, while open to fair question, does not subject the Award to vacatur.

> c.   *Inconsistency with the License Agreement's termination provisions*

BI's most fundamental argument is that the panel's consideration of these two factors— keeping the Aoki family in charge of the restaurant, and hardship to BOT—effectively rewrote the License Agreement, and exceeded its authority, by neutering the License Agreement's termination provisions. The agreement, BI emphasizes, set out in considerable detail the circumstances under which BI would have "good cause" to terminate, including BOT's failure to cure its breach of a substantial term or condition of the agreement within 30 days of notice. *See* BI Br. 1, 4 (noting that License Agreement has four pages of termination provisions); *see* License Agreement, Art. 12.1(g); *id.*, Art. 8.4 (defining as "material event[s] of default" violations of the very provisions that BOT violated). BI argues that the panel, by allowing these provisions to be outweighed in its reasonableness analysis by factors including the perpetual ownership interests of the Aoki family and the business interests of BOT, effectively excised the agreement's termination provisions. BI Br. 6–8, 13, 17–19.

29

There is, again, force to BI's critique, and to the similar critique by dissenting arbitrator Cecchi, who articulately and persuasively faulted the panel for giving limited weight to BOT's sequential and intentional breaches. Were this Court resolving this case as an original matter, it has no doubt—based on the arbitral record, and, separately, based on its familiarity with the controversy, by virtue of having resolved two earlier applications for emergency relief—that given the severity, recurrence, and number of BOT's breaches, it would have upheld as reasonable BI's decision to terminate the License Agreement. Like arbitrator Cecchi, the Court has difficulty viewing the factors to which the arbitral panel pointed as nearly sufficient to offset BOT's record of material defaults and proven disrespect for its fundamental contractual obligations as a franchisee.

The Court's role, however, in adjudicating the dueling applications to confirm or vacate the Award is not to render such a *de novo* judgment. It is far more restricted. After carefully considering whether vacatur is justified based on the limited weight the Award assigned to BOT's breaches in its reasonableness analysis, the Court has concluded it is not. This is so for several reasons.

First, the panel did not exceed its authority by construing the License Agreement so as not to give Article 12's termination provisions decisive weight in applying the flexible standard of reasonableness. Article 13.1, as the panel permissibly construed it, requires two distinct inquiries: one into whether there was a "right" to terminate, and a separate one into the termination's "reasonableness." As to the first, the panel held decisively for BI. The panel ruled that under Article 12 of the License Agreement (the Article covering "Default; Termination"), BI had "good cause" to terminate based on BOT's failure to cure three material breaches (the sale of hamburgers, the advertising of hamburgers, and BOT's failure to list BI as an assured). In

conducting that inquiry, the panel, did not ignore Article 12 or BOT's breaches.  The panel's

second inquiry, into whether the termination was reasonable, took a broader perspective.  The

panel made a holistic assessment of reasonableness, balancing BOT's breaches against factors

the panel viewed as favoring BOT.  As discussed above, BI has made solid arguments why—

contrary to the panel's analysis—these factors should have been assigned limited (if any) weight,

and why decisive weight instead should have been given to BOT's breaches.  However, critically

important, the License Agreement did not define, bind, or delimit the contours of an arbitrator's

reasonableness review.  It instead used the unqualified term "reasonableness."[13]

Under those circumstances, the panel's decision to undertake a wide-ranging assessment

of "fairness" was within its broad authority.

For this reason, a large number of the cases on which BI relies are inapposite.  These

stand for the proposition that, where an arbitrator lacks "*any* contractual basis" for the ultimate

decision reached, that decision may be overturned.  *Oxford Health Plans*, 133 S. Ct. at 2069

(emphasis in original); *see, e.g.*, *Leed Architectural Prods., Inc. v. United Steelworkers of Am.,

Local 6674*, 916 F.2d 63, 64–65 (2d Cir. 1990) (arbitrator exceeded authority in fashioning

remedy directly contrary to collective bargaining agreement under consideration); *In re Marine

Pollution Service, Inc.*, 857 F.2d at 93–96 (vacatur warranted where arbitrator expressly was

"guid[ed by] principle[s] of equity" rather than terms of contract in deciding that contract

between company and its workers inured to benefit of workers of another company); *Collins &

Aikman*, 736 F. Supp. at 484 (arbitrator exceeded authority by awarding terminated employee

---

[13] *Cf. Harper Ins. Ltd. v. Century Indem. Co.*, 819 F. Supp. 2d 270, 278 (S.D.N.Y. 2011)
(arbitrator did not exceed authority by awarding remedy not specifically requested by the parties,
because arbitration provision directed arbitrator "to 'make their award with a view to effecting
the general purpose of this Agreement in a *reasonable* manner, rather than in accordance with a
literal interpretation of the language'" (quoting the contract) (emphasis added)).

damages for post-termination lost sales commissions, which were expressly unavailable under the contract).

In none of these cases did the governing contractual provision impose as flexible and fact-dependent a standard as the arbitrators here were tasked with applying.  In contrast, here, the supple reasonableness clause of the License Agreement, for better or worse, entrusted the arbitral panel with unusually broad latitude to pass judgment on BI's termination decision.  That the panel exercised that latitude in a manner, or to reach an outcome, different than the Court would have *de novo*, is of no moment.  As the Supreme Court has frequently admonished parties that contemplate foregoing conventional litigation for the expedient of arbitration:

> The potential for [] mistakes is the price of agreeing to arbitration.  As we have held before, we hold again: "It is the arbitrator's construction of the contract which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." The arbitrator's construction holds, however good, bad, or ugly.

*Oxford Health Plans*, 133 S. Ct. at 2070–71 (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960)) (alteration and internal citation omitted).[14]

In sum, the Award here, by allowing other considerations to outweigh BOT's material breaches, did not, as BI argues, apply its "own notions of [economic] justice."  *Id.* at 2068 (alteration in original) (quoting *Eastern Associated Coal*, 531 U.S. at 62) (internal quotation marks omitted).  The panel instead conducted an expansive assessment of fairness invited by,

---

[14] BI also argues that the Award was internally contradictory, and therefore should be vacated, because the panel found that BOT committed material breaches and yet concluded that termination was unreasonable, in contravention of New York law.  *See* BI Br. 10 n.8 (collecting cases that "New York law is clear that a material breach of an agreement permits termination").  But these cases are inapposite, as this argument ignores the peculiar reasonableness clause in the License Agreement governing termination of *this* contract, which was not present in those cases.

and within the broad scope of, the License Agreement's undefined reasonableness provision. Its decision therefore "must stand, regardless of [the Court's] view of its (de)merits." *Id.*

Second, to the extent BI argues that the Award effectively bars it from terminating BOT in the event of a future breach, that is incorrect, and in so claiming BI vastly overstates matters. BI implies that, applying the panel's logic, any future breach supplying good cause for termination will be outweighed by the interests in keeping the Honolulu restaurant in the Aoki family and in sparing BOT the consequences flowing from its breaches.

But the Award did not say that, or even close. It did not reason, as BI caricatures, that keeping the Honolulu restaurant in the Aoki family was the "paramount" purpose of the License Agreement, so as always to overwhelm countervailing factors. *Compare* BI Br. 2, 7, *with* Award ¶ 93 (finding "strong indication" that this was "*one of the* essential purposes" (emphasis added)). Instead, the panel balanced that purpose against what it identified as a separate essential purpose reflecting the "*quid pro quo*" between the parties, namely, assuring BOT's "compliance with its obligations under the License Agreement." Award ¶ 93. Important, too, the panel emphasized that BOT's "persistent refusal . . . to cure material violations" was BI's "best argument for the reasonableness of termination." *Id.* ¶ 90.

While the panel here concluded that countervailing factors (including BOT's misguided attempts to cure) counseled against termination, recurring breaches could—easily—lead a future panel to view BOT's conduct as deliberately contumacious, and that panel would be at liberty to do its own balancing, and assess for itself the reasonableness of the termination, based on the record then developed.[15] The instant Award, therefore, does not, at all, preclude a future

---

[15] A future panel might also give weight to the fact that the permanent injunction imposed by the Award becomes, upon today's confirmation, a federal court order. A panel could well regard a breach by BOT of that order—whether found by this Court on a motion for sanctions, or found

termination, or even imply that a termination meeting Article 12's requirements based on a future breach would be outweighed by the factors the Award cited as favoring BOT.[16]

Relatedly, BI argues that, if the panel's ruling based on its subjective assessment of reasonableness is not vacated, BI will lack concrete guidance as to the circumstances under which termination would be reasonable:

> [T]he fact that BI has good cause to terminate and acted in good faith, yet has no way of knowing what factors the arbitrators might consider in analyzing "reasonableness" or whether termination will be deemed reasonable until it has spent nineteen months and more than a million dollars in attorneys' fees arbitrating the issue is a clear indication that the Majority did not apply a test it was authorized to apply.

BI Br. 18; *see also* BI Reply Br. 9.  That argument is unpersuasive.  BI chose to enter into a License Agreement whose text, as construed, made "reasonableness" the measure of a future decision to terminate BOT's license, without setting out finite standards to govern that inquiry.  And BI chose, with BOT, to leave application of that standard to arbitrators, not courts, thereby severely limiting judicial review.  Had BI desired more predictability, it ought to have entered into an agreement that more tightly cabined the trier's discretion.

---

by the future panel itself—as significant in assessing whether a future termination decision was reasonable.

[16] At argument, BOT's counsel conceded that reasonable terminations might be predicated on BOT's complete deviation from the *teppanyaki* style of the restaurant, such as by running a pizza parlor, or permitting conditions at the restaurant that pose serious health hazards.  Tr. 39–40. The Court does not have occasion here to delimit precisely under what circumstances termination would necessarily be reasonable, or under what circumstances an arbitral panel's finding that termination was *unreasonable* would be so egregious that it would cease to draw its essence from the agreement, rendering it voidable by a court.  It is sufficient to note that such limits on the arbitral panel's discretion to apply the "reasonableness" test do exist, but, despite the Court's disagreement with the panel's conclusion, the Award here did not exceed those bounds.

Article 13.1 does indeed leave a degree of uncertainty—for both BI and BOT—as to how a future arbitral panel would apply its reasonableness standard.  But the possibility of disputes and litigation arising out of future termination decisions is inherent in the Agreement's adoption of a broad standard of reasonableness.  It does not mean that the panel "so imperfectly executed [their powers] that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  The Award here has resolved the present controversy by applying a contractually-agreed upon standard to the facts before it, yielding a clear outcome—BI did not reasonably terminate the License Agreement, Award ¶ 118–19—if one unsatisfactory to BI.  The possibility that future disputes will arise over application of this flexible contractual standard to future fact patterns does not make the Award subject to vacatur as indefinite.[17]

In sum, given the breadth of the contractual term, the panel did not exceed its authority— or rewrite the License Agreement—by construing "reasonableness" to equate to "fairness" and by considering a range of factors as relevant.  "The arbitrator's construction holds, however good, bad, or ugly."  *Oxford Health Plans*, 133 S. Ct. at 2071.

### 2.    The Panel's Classification of Certain Breaches as Immaterial

In a separate argument, BI argues that the panel exceeded its authority when it ruled that four other breaches were immaterial, notwithstanding the License Agreement's classification of them as material.

---

[17] The cases vacating arbitral awards for being indefinite or nonfinal on which BI relies are therefore inapposite.  *See* BI Br. 24 (citing *Bell Aerospace Co. Div. of Textron v. Local 516, Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW)*, 500 F.2d 921, 924 (2d Cir. 1974) (remand of arbitral decision for clarification required where parties could not decipher the outcome the award provided)); BI Reply Br. 9 (citing *Bd. of Educ. of Amityville Union Free Sch. Dist. v. Amityville Teacher's Ass'n*, 880 N.Y.S.2d 138, 140 (2d Dep't 2009) (applying standard for "indefinite or nonfinal" awards under New York law, not the FAA)).

One discrete incident involved BOT's unauthorized use of BI's service marks and trade name through its Beni Girls promotional campaign. The panel found that BOT neither sought nor obtained prior approval for this promotional campaign. Award ¶ 53; *see also id. ¶* 7 (finding Article 5.2 provided that "[a]ny and all advertising . . . employing in any way whatsoever the words 'Benihana,' 'Benihana of Tokyo' or the [Benihana] 'flower' symbol shall be submitted to [BI] for its approval prior to publication or use." (quoting the License Agreement) (internal quotation marks omitted)). But, it appeared to hold, this was not a material breach. *See id.* ¶ 56 (campaign not "detrimental" to BI's image); *id.* ¶¶ 61, 68–69, 76, 78, 90, 92 (treating the sale of hamburgers, advertising of hamburgers, and failure to add BI as additional assured as the only material breaches). The other three breaches were those found in BI's post-termination audit. These involved additional violations of Article 5.2 (based on BOT's unauthorized, non-hamburger related advertisements), of Article 8.1(c) (based on BOT's sale of lower quality ingredients, not, as required, "only those items which are sold by [BI] in its company-owned restaurants" or "are approved by [BI] in writing"), and of Article 8.1(g) (based on BOT's allowing a third-party vendor to sell photographs to its customers, in breach of the prohibition on BOT's "permit[ting] others to carry on or conduct any other business activity or operation from the Restaurant['s] premises" and " grant[ing] to any third party any concession or license to operate at the Restaurant[]" without BI's consent). Award ¶ 57; License Agreement, Arts. 5.2, 8.1(c), 8.1(g). As to these three, the panel, while appearing to accept the audit's finding of breaches, found them non-material. Award ¶¶ 59, 61.[18]

---

[18] As noted *supra* note 6, the Award does not expressly state that BOT's actions in these four respects were breaches of the License Agreement, but appears to find as such by implication, as a predicate to the later holding that they were not "material." The Court does not read the panel's later "observ[ation]" that BOT was, as of the date of the Award, "compliant with [this Court's] preliminary injunction," to suggest the contrary; that remark was based on the absence of any

The panel clearly erred in classifying these four breaches as non-material.  Article 8.4 of the License Agreement unambiguously provides that "*any* failure to comply with the covenants and agreements in this Article 8, or with covenants and agreements in Article 5 hereof with respect to the Marks . . . , *shall* constitute a *material* event of default under this Agreement." License Agreement, Art. 8.4 (emphasis added).  All four of these violations were of a covenant in Article 5 or 8.  The panel acknowledged, yet with respect to these breaches ignored, this provision.  *See* Award ¶¶ 59, 70–71.

Although patent, the panel's error as to this point does not justify vacatur of the Award. With the panel's having found three other breaches material—based on the sale and advertising of hamburgers and the failure to list BI as an additional assured—"good cause" to terminate was established independent of how the panel classified these four breaches.  And in conducting the second stage of its inquiry, into the reasonableness of termination, the panel's discussion of the material breaches makes clear that its approach at this stage was to consider each breach not by its formal classification, but based on the nature of the conduct amounting to the breach.[19]  The License Agreement's "reasonableness" clause did not preclude this mode of measuring the

---

motion for, or finding of, contempt, not on an independent assessment of BOT's behavior.  *See* Award ¶ 98 (citing Arb. Tr. 479 (BI conceding it had not moved for sanctions)).

[19] Thus, as to BOT's sale and advertising of hamburgers, the panel downplayed the severity of these breaches by "not[ing] that many high-end restaurants serve hamburgers[, and that o]n a superficial level, the addition of a hamburger, which is a popular menu item at a beach-side restaurant, would seem to be a trivial violation."  *Id.* ¶ 76.  And, the panel stated, "no evidence was adduced that [BI] suffered any damage to the brand" as a result of hamburger sales.  *Id.* ¶ 91 n.11.  Finally, as to BOT's failure to name BI as an additional assured, the panel stated, without explanation as to the basis for its assessment, that BI and BOT would always be sued together, and that "the defense and indemnity would properly be tendered to the carrier" in any event.  *Id.* ¶ 93; *see* BI Br. 11–12.

significance of violations to evaluate BI's decision to terminate.  The panel therefore did not exceed its authority by using it.[20]

### 3.  Fundamental Fairness and Due Process

BI next argues that the Award deprived it of "fundamental fairness and due process." Although BI arguably diagnoses infirmities with the panel's approach, none rises to the level of supporting vacatur.

An arbitral award may be vacated where "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy."  9 U.S.C. § 10(a)(3).  A

---

[20] BI relatedly argues that the Award should be vacated because its treatment of the various breaches was internally inconsistent, most notably, in concluding that advertising hamburgers was a material breach, but other unapproved advertising was not.  BI Br. 11 n.9; *see also id.* (criticizing as internally contradictory the panel's statement that BOT was compliant with this Court's preliminary injunction, notwithstanding factual findings regarding unapproved advertisements and publicity campaigns that, under the License Agreement, required a finding of not only a breach but a material breach).  But such internal inconsistency as to intermediate issues does not support vacatur.  Rather, the cases BI relies on support the proposition that an Award may be vacated if it provides for an *outcome* that contradicts its factual findings or legal conclusions.  *See HRH Constr., LLC v. Local No. 1 Int'l Union of Labor Constructors, AFL-CIO*, No. 03 Civ. 8944 (DC), 2005 WL 31948, at *6 (S.D.N.Y. Jan. 5, 2005) (stating that "a contradictory award should not be confirmed"—though finding a material question of fact prevented summary confirmance or vacatur—in context of award that appeared to find both that it possessed and that it lacked authority to resolve dispute, and that there was no remedy for instant contract dispute but nonetheless awarded remedy as to future applications); *Local 814, Int'l Broth. Of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Sotheby's Inc.*, 665 F. Supp. 1089, 1093 (S.D.N.Y. 1987) (vacatur justified where award found employee's discharge not warranted, contradicting its "express findings" that worker's "behavior constituted 'dishonesty'" and that contractual provision permitted discharge for dishonesty (internal quotation marks and citation omitted)); *see also Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Hollywood Heating & Cooling, Inc.*, 88 F. Supp. 2d 246, 252–53 (S.D.N.Y. 2000) ("So long as the award does not directly contradict the express language of the [contract], the award will generally be held to draw its essence from the agreement"; discussing "the award" as the arbitrators' ultimate "decisions" and "determinations"), *aff'd*, 1 F. App'x 30 (2d Cir. 2001) (summary order); *cf. Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003) ("An arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the *outcome* reached." (alteration, internal quotation marks, and citation omitted) (emphasis added)).

court may vacate an award under this provision "only if 'fundamental fairness is violated.'" *NFL*, 820 F.3d at 545 (quoting *Tempo Shain*, 120 F.3d at 20).  "It is well settled that procedural questions that arise during arbitration, such as which witnesses to hear and which evidence to receive or exclude, are left to the sound discretion of the arbitrator and should not be second-guessed by the courts."  *Id.*

The Second Circuit's recent decision in *NFL* usefully illustrates these principles.  At issue was the decision of an arbitrator—the NFL Commissioner, pursuant to a collective bargaining agreement—to suspend quarterback Tom Brady for involvement in a scheme to deflate footballs below their permissible pressure range.  *Id.* at 531–32.  The Circuit addressed but rejected two challenges to the fairness of the arbitration, both implicating the arbitral process.  One involved the Commissioner's decision to deny the Players Association's request, on behalf of Brady, to call the NFL general counsel as a witness to testify to his involvement in preparing an investigative report.  *Id.* at 545–46.  The Circuit held that excluding the general counsel as a witness did not violate fundamental fairness because his testimony involved "concerns that were collateral to the issues at arbitration," and, in any event, the testimony of other witnesses covered the same ground.  *Id.* at 546.  The second issue involved the denial of, effectively, a discovery request by the Players Association to review the investigative team's notes and memoranda.  *Id.* at 546–47.  The Commissioner ruled that the CBA did not require production of such notes, and because he had not reviewed them in resolving the case, Brady was not deprived of fundamental fairness through their non-disclosure.  *Id.*  The Circuit held that the Commissioner was thereby "at the very least, 'arguably construing or applying the contract'" in making these rulings, and "there is simply no fundamental unfairness in affording the parties precisely what they agreed on."  *Id.* at 547 (quoting *Misco*, 484 U.S. at 38).

Of BI's various claims of procedural violations, only one falls into the framework set by 9 U.S.C. § 10(a)(3). BI argues that the panel, acting through its chairman, denied it the opportunity to submit a Third Circuit decision, issued on August 11, 2015, warranting vacatur. That decision affirmed a Delaware district court's grant of summary judgment in favor of BI against BOT in a separate case, brought by BOT in December 2010, concerning alleged violations by BI of the ARA concerning the use of the Benihana trademarks. BI Br. 20–21; Pet. ¶ 38 n.2; *see Benihana of Tokyo, Inc. v. Benihana, Inc.*, 59 F. Supp. 3d 654, 656 (D. Del. 2014), *aff'd*, 622 F. App'x 169 (3d Cir. 2015). On September 4, 2015—after the mandate in that case issued—BI submitted the decision, with an explanatory letter, to the AAA administrator, who forwarded it to the Chairman. BI Br. 20–21. BI argues that the Third Circuit decision bore on the history of the BI/BOT relationship. The panel chairman declined to accept the decision, stating that "[t]here is no basis to reopen" the case record, which had closed on August 17, 2015. Munn Decl., Ex. 27; Award ¶ 31.

BI now argues that excluding this evidence deprived it of due process and fundamental fairness, as it would have undermined the panel's "indisputably erroneous conclusion that "[t]he parties had no serious disputes for 15 years. Things changed in 2012 when [BI] was acquired by a new owner that began to insist on strict compliance with the License Agreement.'" BI Br. 21 (quoting Award ¶ 10).

The Court holds that the decision by the Chairman, who was responsible for making evidentiary and procedural decisions on behalf of the panel, was within his discretion and did not compromise the proceeding's fundamental fairness. The arbitral record was by then closed, and reopening it to receive a court decision recapping aspects of the parties' history had the potential to invite additional submissions and prolong the proceedings. Moreover, although the history of

the parties' relationship was covered by the panel's factual findings, it was of background, not central, relevance.  And because the Third Circuit decision did not involve the Honolulu restaurant, it was decidedly "collateral to the issues at arbitration."  *NFL*, 820 F.3d at 546.  To the extent the panel's factual statement that "[t]he parties had no serious disputes for 15 years . . . [which] changed in 2012" was not implicitly limited to the Honolulu restaurant and was therefore not correct, this error of fact—one of secondary importance, no less—is not grounds for vacatur.

BI's other arguments relating to process and fairness essentially repackage arguments already covered.  For example, BI argues that the panel's "crucial conclusions" regarding the "essential purpose" of the License Agreement to keep the Honolulu restaurant in the Aoki family forever was "never discussed in the arbitration and [had] simply no basis in evidence."  BI Br. 19; *see also* BI Reply Br. 1, 4.  But fundamental fairness did not require the panel to give the parties advance notice of the premises of, or language to be used in, the Award.  And, as discussed, the panel's inference as to the parties' expectation regarding BOT's tenure at that restaurant, while inaptly put, derived from the structure of the License Agreement.

BI makes other claims reprising its substantive challenges, for example, arguing that the panel drew conclusions that lacked a basis in evidence, ignored BI's contrary evidence, or were internally contradictory.  *See* BI Br. 19 n.15 (panel drew unfounded and "out-of-the-blue conclusion" about the presence of the "or the reasonableness thereof" termination provision in BOT's own franchise agreements); *id.* at 21 n.16 (panel disregarded evidence of litigation between the parties before 2012); *id.* at 22 & nn. 17–18 (panel made incorrect findings or reached contradictory conclusions by (1) observing that BOT was "compliant" with preliminary injunction, relying on the lack of a BI motion for contempt, despite BOT's clear violation of the

preliminary injunction via, at least, the unapproved Beni Girls campaign; (2) awarding BI attorneys' fees but not costs for the arbitration, notwithstanding Article 8.5's provision for costs and fees when BOT is the breaching party; and (3) finding BOT financial documents "sufficient evidence" of Honolulu restaurant's profitability, while finding no "competent evidence" sufficient to calculate BOT's profits after termination for purpose of awarding BI trademark damages (quoting Award ¶¶ 67 n.7, 102) (internal quotation marks omitted); *id.* at 23 (panel disregarded BI's evidence, in particular, regarding value of Honolulu restaurant relative to its worldwide franchise rights). BI does not cite any authority to the effect that these asserted flaws in the Award are a sufficient basis for vacatur based on the denial of due process or fundamental fairness.

***

For all of the above reasons, the Court holds that the panel acted within its broad authority in issuing the Award. Therefore, BI's petition to partially vacate the Award is denied,[21] and BOT's cross-petition to confirm the Award in full is granted.

## III.   Attorneys' Fees

BI separately seeks an award of attorneys' fees and costs associated with the enforcement of its rights under the License Agreement and the Petition. Pet. at 14; BI Br. 25. BOT is obliged under the License Agreement to "pay all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by [BI] in connection with the enforcement of [] Article 8 or of Article 5 provided that [BOT] is determined to be the breaching party." License Agreement,

---

[21] In a footnote in the Petition, BI also sought vacatur of the portion of the Award denying it trademark damages for BOT's unauthorized use of Benihana trademarks post-termination. Pet. 2 n.1. BI does not press this point in its briefs and, in any event, because the Court here affirms the Award's denial of termination, BI is not entitled to such damages. *See* Award ¶ 101.

Art. 8.5.  Holding that BOT was the breaching party, the panel awarded BI reasonable attorneys'

fees on that basis.  Award ¶ 103.

The Court therefore finds that BI is entitled to an award of reasonable attorneys' fees and

costs associated with enforcing its rights through confirmation of the Petition.  The Court below

sets out a timeline for BI to submit documentation accounting for the costs and the reasonable

attorneys' fees it incurred in this action.  However, such fees and costs will be awarded only to

the extent that BI would have been incurred them in an effort to confirm the Award.  (Because

BOT sought confirmation of the Award, it is reasonable to expect that BI's submission seeking

confirmation would have been more brief, and entailed far fewer attorney hours and costs, than

did submissions in support of the Petition, which was overwhelmingly directed at BI's bid to

vacate the panel's ruling that termination was unreasonable.)  Should BI choose to pursue such

fees and costs, in submitting documentation of them, BI is to be mindful that BOT must be

assumed to have contemporaneously advocated for the same result—wholesale confirmation.

## IV.     Sanctions

After briefing on the cross-petitions to confirm or partially vacate the Award, BOT

moved for Rule 11 sanctions against BI's counsel, arguing that BI's petition to partially vacate

the Award was frivolous.  *See* Rule 11 Motion; BOT Rule 11 Br.  For the reasons that follow, the

Court, emphatically, denies BOT's motion for sanctions.

Federal Rule of Civil Procedure 11 confers on a district court authority to sanction a

litigant or its counsel.  It provides, in relevant part:

> By presenting to the court a pleading, written motion, or other paper . . . an attorney
> . . . certifies that to the best of the person's knowledge, information, and belief,
> formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause
> unnecessary delay, or needlessly increase the cost of litigation; [and]

(2) the claims, defenses, and other legal contentions are warranted by existing law
or by a nonfrivolous argument for extending, modifying, or reversing existing law
or for establishing new law[.]

Fed. R. Civ. P. 11(b).

Rule 11(c)(2) sets forth the procedure to be followed where counsel pursues sanctions based on the offending attorney's court submissions.  Relevant here, Rule 11(c)(2) creates a "safe harbor" that gives the offending attorney a chance to modify or withdraw the challenged submission so as to avoid sanctions.  *See In re Pennie & Edmonds LLP*, 323 F.3d 86, 89–90 (2d Cir. 2003).  Under that provision, a motion for sanctions is initially to be served only on the offending attorney, and not filed with the Court.  A motion for sanctions can be filed with the Court only if, 21 days after such service, the challenged submission has not been "withdrawn or appropriately corrected."  Fed. R. Civ. P. 11(c)(2).  Sanctions may not be awarded under Rule 11(c)(2) where proper notice and opportunity to withdraw or correct the filing were not provided to the party to be sanctioned.  *Lawrence v. Richman Grp. of CT LLC*, 620 F.3d 153, 158 (2d Cir. 2010).

When such a motion is properly filed, the Court may impose sanctions if the offending attorney responsible for the submission is found to have acted with "objective unreasonableness."  *In re Pennie & Edmonds LLP*, 323 F.3d at 90; *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009); *Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 166 (2d Cir. 1999) ("Rule 11(b)(2) 'establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments.'" (citing Fed. R. Civ. P. 11 advisory committee note to 1993 amendments)).  "In other words, Rule 11 is violated if a pleading is submitted for 'any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for

the extension, modification, or reversal of existing law.'" *Watkins v. Smith*, No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *5 (S.D.N.Y. Feb. 22, 2013) (quoting *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002)).  When a party's legal contentions are challenged as violating Rule 11, the "operative question is whether the argument is frivolous, *i.e.*, the legal position has no chance of success, and there is no reasonable argument to extend, modify, or reverse the law as it stands." *Fishoff v. Coty lnc.*, 634 F.3d 647, 654 (2d Cir. 2011) (internal quotation marks and citation omitted); *see also Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012); *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) ("Rule 11 targets situations where it is patently clear that a claim has absolutely no chance of success." (internal quotation marks and citation omitted)).  "The decision whether to impose a sanction for a Rule 11(b) violation is [] committed to the district court's discretion." *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004).

The Court denies BOT's motion for sanctions for two reasons.  First, BOT appears to have failed to comply with the procedural requirements of Rule 11(c)(2).  Although BOT indicates that its counsel, shortly after the Petition was filed, notified BI's counsel that BOT would seek Rule 11 sanctions if the Petition were not withdrawn, BOT Rule 11 Br. 1; Manson Rule 11 Decl., Ex. J.  BOT has not anywhere represented that it served BI with its motion for sanctions before filing its sanctions motion with the Court, as the Rule requires.  The motion may be denied on that basis alone.  *Lawrence*, 620 F.3d at 158.

In any event, the Court also finds that BI's Petition, and the arguments made in support of it, were not—at all—frivolous.  BI's counsel's argument that the panel exceeded the bounds of its authority was not objectively unreasonable.  Indeed, the dissenting arbitrator made the very same argument.  And as the above opinion chronicles, the panel's analysis was problematic or

45

questionable in various respects.  The decision to confirm the Award, as opposed to granting the petition to partially vacate it, gave the Court considerable pause, and BI's petition seeking that relief presented a genuinely close question.  Far from being frivolous or its being "patently clear that [BI had] absolutely no chance of success," *Healey*, 947 F.2d at 626, BI's argument that the panel overstepped its bounds was substantial.  BI faced a "high hurdle" in seeking to vacate the Award, *Stolt-Nielsen*, 559 U.S. at 671, and it came close to clearing that hurdle.  Indeed, BOT's bid here for Rule 11 sanctions came far closer than BI's bid for partial vacatur to meriting such sanctions.

For both reasons, independently, BOT's motion for sanctions is denied.

## CONCLUSION

For the foregoing reasons, BI's Petition to partially vacate the Award is denied, BOT's Cross-Petition to confirm the Award is granted, and BOT's motion for sanctions is denied.

Pursuant to the Award ¶¶ 118–221, it is therefore hereby ORDERED that:

1.     Benihana, Inc.'s termination of the License Agreement is declared to be unreasonable.

2.     Benihana of Tokyo, LLC is hereby permanently enjoined from selling hamburgers or other unauthorized food items on the premises of, or in any manner in connection with, any Benihana restaurant it operates in Hawaii pursuant to a license from Benihana, Inc., whether such sales occur in the restaurant, on the patio or anywhere else.

3.     Benihana of Tokyo, LLC is hereby permanently enjoined from using or publishing, in connection with any Benihana restaurant it operates in Hawaii pursuant to a license from Benihana, Inc., advertisements, publicity, signs, decorations, furnishings, equipment, or other matter employing in any way whatsoever the words 'Benihana,' 'Benihana of Tokyo,' or the 'flower' symbol that have not been approved in accordance with Article 5.2 of the License Agreement.

4.     Benihana of Tokyo, LLC is further ordered to cause Benihana, Inc. to be named as an additional insured on all insurance policies relating to the operation of Benihana restaurants in the state of Hawaii.

5.     Benihana, Inc. is awarded $1,130,643.80 as reasonable attorneys' fees.

6.    The administrative fees of the AAA totaling $13,700.00 and the fees of the panel chair, Steven Skulnik, totaling $37,687.50 shall be borne as incurred.

It is further ORDERED that Benihana, Inc. is awarded reasonable attorneys' fees and costs in connection with this action, in an amount to be determined.  BI is directed to submit any documentation in support of its request for reasonable attorneys' fees and costs in connection with this petition by July 22, 2016.  BOT may file objections to BI's submissions by July 29, 2016.

The Clerk of Court is directed to close the motions pending at docket numbers 21 and 32, and to enter judgment.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 15, 2016
New York, New York

47