```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/22/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

BENIHANA, INC., as successor to BENIHANA
NATIONAL CORP.,

        Petitioner,

-v-

BENIHANA OF TOKYO, LLC, as successor to
BENIHANA OF TOKYO, INC.,

        Respondent.

------------------------------------------------------------X

15 Civ. 7428 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

  This decision, in this latest in a long-running series of lawsuits between two entities owning aspects of the operations of the Benihana restaurant empire, resolves an application for attorneys' fees and costs. Petitioner Benihana, Inc. ("BI") seeks an order directing respondent Benihana of Tokyo, LLC ("BOT") to pay BI for the fees and costs it reasonably incurred in attempting to enforce a permanent injunction that this Court entered on July 15, 2016, Dkt. 42 (the "Injunction"). On June 14, 2017, following an evidentiary hearing conducted on June 6 and 14, 2017, the Court, in a lengthy bench decision, found BOT in civil contempt for its failure to comply with the Injunction. Dkt. 84. The Court put in place a detailed regime of sanctions to coerce compliance with the Injunction. The Court also ordered that BOT pay the reasonable legal and investigative fees that BI reasonably incurred in connection with its efforts to establish violations of, and obtain compliance with, the Injunction.

  The remaining issue is the amount of the award of fees and costs. BI has requested a total award of $1,062,251.34, reflecting fees and expenses across its two law firms, while BOT

argues that BI is entitled to no more than $49,918. Following its close examination of BI's request, the Court holds that although BI reasonably incurred substantial fees and costs in establishing BOT's contempt with the Injunction, to assure reasonableness, BI's request must be pruned. The end result is that BI is awarded a total of $634,680.04.

## I. Background

The Court assumes familiarity with the facts and the baroque procedural history of this case and the related litigation between BI and BOT. The Court has summarized these in various decisions and in its June 14, 2017 bench ruling. The Court sets forth here only the background most central to the present fee dispute.

On September 18, 2015, BI filed a petition seeking the partial confirmation and partial vacatur of an award resulting from an arbitration before the American Arbitration Association between BI and BOT. BOT had initiated that arbitration on January 13, 2014. BOT sought a declaration that, contrary to BI's claim, BOT had not breached the License Agreement between the parties in connection with BOT's operation of a Benihana restaurant in Honolulu, Hawaii. BOT also sought a judgment that BI's termination of BOT under the License Agreement as the franchisee entitled to operate that restaurant was unjustified. On September 18, 2015, the arbitral panel, by a 2-1 vote, issued its award. It found that BOT had committed numerous material breaches of the License Agreement, justifying entry of injunctive relief against BOT, but that, based on the panel's interpretation of the terms of the License Agreement, BI's termination of BOT's license had not been justified.

On July 15, 2016, the Court confirmed the arbitral award in full. The Court thereby entered, as a court order, the Injunction, which tracked the terms of the injunction embodied in

2

the arbitral award. *See* Dkt. 42. The Injunction obliged BOT to comply with various aspects of the parties' License Agreement.

Over the ensuing approximately one half year, BI, largely through its outside counsel and its agents, including professional investigators, actively monitored BOT's activities and BOT's compliance—and, dismayingly often, its failure to comply—with the Injunction. BI discovered widespread and continuing breaches of the Injunction by BOT. The record, which includes extensive and detailed correspondence between BI's counsel and BOT, reflects BI's persistent and vigorous attempts to put BOT on notice of its breaches and BI's attempts to induce BOT to cure these breaches without need for recourse to this Court. As chronicled in the Court's detailed bench ruling on June 14, 2017, these efforts had only limited success and rectified BOT's breaches in only discrete areas of breaching conduct.

On January 9, 2017, nearly six months after entry of the Injunction, BI filed in this Court a motion for sanctions and for a finding that BOT was in civil contempt for violating various terms of the Injunction, and included supporting declarations and factual materials. Dkts. 55–57. BOT opposed the motion and included declarations. Dkts. 60–62. On April 25, 2017, the Court notified the parties that it would entertain contempt sanctions only as to conduct post-dating the Court's entry of the Injunction on July 15, 2016, but not as to conduct occurring between the date of the arbitral award and the Court's confirmation of it. Dkt. 68. The Court also ascertained from counsel that they wished the Court to resolve BI's claims of contempt through a hearing with live testimony, not based solely on the parties' documentary submissions.

On June 6 and 14, 2017, the Court held an evidentiary hearing at which it heard live testimony and received numerous exhibits. On June 14, 2017, the Court issued a detailed bench opinion making findings of fact and holding that BOT was in civil contempt of court. To coerce

3

BOT's compliance with the Injunction going forward, the Court instated a regime of financial sanctions intended to incent BOT to comply as to four key areas of conduct in which the Court had found violations of License Agreement terms as incorporated in the Injunction. These involved the Honolulu restaurant's (1) regular menus, (2) holiday menus, (3) signage, and (4) photographs furnished to patrons of the restaurant. Relevant here, the Court also ruled that BOT must pay the legal and investigative fees that BI had reasonably incurred in bringing about BOT's compliance with the Injunction.

On June 28, 2017, BI filed its application for attorneys' fees in the form of declarations submitted by its lead counsel, Alan H. Fein, Esq., Dkt. 86 ("Fein Decl."), of the Miami, Florida law firm Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. ("Stearns Weaver"), and by its local counsel, Nicole Gueron, Esq., Dkt. 85 ("Gueron Decl."), of Clarick Gueron Reisbaum LLP ("Clarick Gueron"). The declarations reported the firms' fees and costs incurred and, as exhibits, attached counsel's contemporaneous time records, regular billing rates and professional biographies. On July 12, 2017, BOT filed a memorandum of law in opposition to BI's fees request. Dkt. 87.

## II. Applicable Legal Standards

To determine a reasonable attorneys' fee, a court uses the lodestar approach, in which the court determines a "presumptively reasonable fee" by calculating the number of hours reasonably expended by counsel on the litigation and multiplies that number of hours by a reasonable hourly rate. *E.g., Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quotation omitted). "The district court enjoys broad discretion in determining the amount of a fee award." *Vincent v. Comm'r of Social Sec.*, 651 F.3d 299, 307 (2d Cir. 2011).

In determining the reasonable hourly rate, the Court's analysis is guided by the market rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). The relevant community is the district in which the district court sits. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 190–91 (2d Cir. 2008). The determination of the reasonable hourly rate is a case-specific inquiry and may sometimes require a court to conduct an evidentiary hearing when "it is evident that the material facts necessary to determine the fee award are genuinely in dispute and cannot be resolved from the record." *Vincent*, 651 F.3d at 308 (quoting *Farbotko v. Clinton Cty.*, 433 F.3d 204, 209 (2d Cir. 2005) (modifications omitted)). The Court is to evaluate the evidence offered by the parties and may, of course, take "judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." *Farbotko*, 433 F.3d at 209. Overall, "[a] district court may adjust the lodestar when it does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Millea*, 658 F.3d at 167 (quotation omitted).

In determining the reasonableness of the hours counsel expended, "the district court examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case." *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997). A court-awarded attorneys' fee must compensate only for "hours reasonably expended on the litigation," not for "hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983). If the number of hours reported worked by counsel is disproportionate to the work performed, the Court should reduce the stated hours accordingly. *See id.* at 433; *Seitzman v. Sun Life Assurance Co. of Can.*, 311 F.3d 477, 487 (2d Cir. 2002).

As part of determining whether the hours expended by counsel were reasonable, a court may draw on its "first-hand knowledge of [the] litigation and its extensive contact with the parties." *Luciano*, 109 F.3d at 117. Where it is difficult to make line-item reductions that adjust for excessive billing, "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (quotation omitted)); *see also N.Y. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1145–48 (2d Cir. 1983) (approving percentage reductions to correct deficiencies in fee application, including "excessive claims for certain tasks" and "inadequate detail in documentation," *id.* at 1142).

A generally disfavored billing practice is "block billing," which refers to the practice of "grouping multiple tasks into a single billing entry, so as to leave unclear how much time was devoted to each constituent task." *Themis Capital v. Dem. Rep. Congo*, No. 09 Civ. 1652 (PAE), 2014 WL 4379100, at *6 (S.D.N.Y. Sept. 4, 2014). Block billing is disfavored because it impairs both the client's ability to understand the precise time allocable to the particular tasks for which it is being billed, and, in the event of a later fee application, the court's ability to evaluate whether the time expended by counsel on any given task was reasonable. *See Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010) (summary order); *Ramirez v. Benares Indian Rest. LLC*, No. 14 Civ. 7423 (JMF), 2015 WL 926008, at *2 (S.D.N.Y. Mar. 4, 2015) (collecting cases).

However, block billing, although disfavored, does not automatically preclude recovery for the hours billed by counsel. In general, courts make reductions to block-billed hours in circumstances when (1) there is reason to believe that the hours billed were independently

6

unreasonable; (2) the block billing involved aggregating tasks that were not all compensable; or (3) the number of hours block billed together was so high (such as five hours or more) so as to create an unacceptable risk that the aggregated total exceeded the reasonable hours worked on compensable tasks. *See Adusumelli v. Steiner*. Nos. 08 Civ. 6932, 09 Civ. 4902, 10 Civ. 4549 (JMF), 2013 WL 1285260, at *4 (S.D.N.Y. March 28, 2013); *Adorno v. Port Auth. of N.Y. & N.J.*, 685 F. Supp. 2d 507, 515 (S.D.N.Y. 2010) ("While block billing is disfavored and may lack the specificity required for an award of attorneys' fees, it is not prohibited as long as the court can determine the reasonableness of the work performed." (citation and quotation omitted)); *see also Abdell v. City of New York*, No. 05 Civ. 8453 (RJS), 2015 WL 898974, at *4 (S.D.N.Y. Mar. 2, 2015) (approving block-billed time when it was "for temporally short entries combining related tasks"); *Charles v. City of New York*, No. 13 Civ. 3547 (PAE), 2014 WL 4384155, at *5–6 (S.D.N.Y. Sept. 4, 2014) (reducing fee award based on block-billed entries spanning between 5–10 hours each). Courts generally reduce block-billed time or excessively expended hours by 15–30%. *See Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 57 (S.D.N.Y. 2015) (collecting cases).

Attorneys' fees awards also include "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *Hernandez v. JRPAC Inc.*, No. 14 Civ. 4176 (PAE), 2017 WL 66325, at *2 (S.D.N.Y. Jan. 6, 2017) (quotation and citation omitted). "The requesting party must substantiate the request for costs," which can be accomplished by providing extrinsic proof, such as an invoice or receipt. *Id.* "A sworn statement or declaration under penalty of perjury that certain amounts were expended on particular items is ordinarily also sufficient." *Id.* (citing *Abel v. Town Sports Int'l LLC*, No. 09 Civ. 10388 (DF), 2012 WL 6720919, at *34 (S.D.N.Y. Dec. 18, 2012)).

## III. Application

The Court has carefully reviewed BI's fees application and time records along with BOT's opposition papers. BOT mainly argues that BI's time entries (1) include time not spent on obtaining BOT's compliance with the permanent injunction, (2) reveal extensive block billing, (3) reveal unduly partner-heavy staffing, and (4) reflect unreasonably high billing rates and hours. BOT argues that BI is entitled to no more than $49,918. This figure, however, rather than being anchored in the facts of this case, appears to reflect a fee award issued by a different judge in an unrelated litigation involving different parties and issues.[1]

The Court considers first the hourly rates charged by BI's personnel in light of the rates prevailing in this District for equivalently complex legal work. For each timekeeper, the rates charged, and the experience levels, are as follows. For the Stearns Weaver personnel: Alan H. Fein, a partner with 38 years of experience, between $675 and $750 per hour; Joshua A. Munn, a partner with 18 years of experience, between $495 and $550 per hour; Andrea N. Nathan, a partner with 12 years of experience, between $350 and $450 per hour; Jeana M. Reed, an associate with seven years of experience, between $350 and $395 per hour; and Veronica de Zayas, an associate with six years of experience, $375 per hour.[2] *See* Fein Decl. ¶¶ 55–63; Ex.

---

[1] A fee award in that amount was ordered in connection with a motion for civil contempt in *In re: Soundview Elite, Ltd.*, No. 15 Civ. 5666 (KPF), 2016 WL 1178778, at *6, *15 (S.D.N.Y. Mar. 23, 2016). That case and the issues presented bear no resemblance to this. Among many differences, this case involved an exceptionally extended pre-motion investigation by moving counsel, followed by claims of numerous breaches, extended briefing, and a two-day evidentiary hearing requested by the parties. Also unlike here, the parties in *In re: Soundview Elite* agreed on the amount of the fee award. *See id.* at *15.

[2] BI also seeks fees for the work of Molly J. Bowen, a Stearns Weaver associate who left the firm in July 2016. *See* Fein Decl. ¶¶ 55, 61; Ex. A. But, because the Court is not awarding any fees for work before the entry of the Injunction on July 15, 2016, and because Ms. Bowen's time entries predate July 15, 2016, the Court will not award any fees for her time.

C. BI also seeks fees at the rate of $250 per hour for the time its paralegal spent preparing for and managing the presentation to the Court of the exhibits (for both parties). *Id.* ¶ 64 & n.17, Exs. A, B. And for the Clarick Gueron attorneys: Nicole Gueron, a partner with 22 years of experience, $640 per hour; and Courtney Milianes, an associate with six years of experience, $395 per hour. *See* Gueron Decl. ¶¶ 17–20; Ex. B.

For a number of reasons, the Court holds that these rates are reasonable. This case has presented complexities, factual and legal. The course of relevant dealings between the parties, in the various litigations and in BI's assiduous out-of-court attempts to induce compliance by BOT with the Court's Injunction, which forms a key context of the contempt proceedings, is complex, too. And BOT's serial disobedience, chronicled by now in multiple court and arbitral rulings, presented legal and strategic challenges for BI's counsel. BI counsel's many detailed and—for the most part, appropriately measured—letters to BOT, putting it on notice of violations of the Injunction, are tangible evidence of the factual and historical complexity of the controversy.

The rates BI charged are also broadly consonant with those commonly charged by similarly experienced commercial litigators in this District in case involving work of similar complexity. This Court is well familiar with those rates, based on its experience both on the bench and previously as a commercial litigator. And BOT, notably, did not object to the similar, albeit slightly lower, rates that BI sought and which Magistrate Judge Ronald Ellis recommended that the Court approve as reasonable in a report and recommendation as to an attorneys' fee award to BI following an earlier BI/BOT dispute. *See* Dkt. 30 in No. 14 Civ. 792 (PAE) (RLE) (S.D.N.Y. Aug. 6, 2015). This Court, in turn, in adopting in part Judge Ellis's recommendation, found those rates reasonable. *See* Dkt. 52 in No. 14 Civ. 792 (PAE) (RLE), *reported at Benihana Inc. v. Benihana of Tokyo, LLC*, No. 14 Civ. 792 (PAE), 2016 WL 3647638, at *2–3

9

(S.D.N.Y. June 29, 2016). And, to the extent that BOT argues now that an evidentiary hearing as to market rates in this District is required insofar as it argues BI's support for such rates is inadequately documented, the Court concludes otherwise. On this record, there is no need, or factual predicate, for such a hearing.

As to the hours expended, however, the Court concludes that it must prune the hours on which BI bases its fee request, for three reasons.

First, to the extent that BI seeks an award reflecting work performed by its counsel prior to the Court's entry of the Injunction on July 15, 2016, the Court declines to award BI for such efforts. Although BI's vigorous efforts to enforce the terms of the parallel arbitral injunction that preceded the Court's Injunction were certainly directed towards the same end of assuring BOT's compliance with the parties' License Agreement, the Court explicitly notified counsel that it would entertain a contempt sanction only for violations of the Court-imposed Injunction. *See* Dkt. 68. It follows that an award of fees is merited only for BI's efforts to bring about compliance with that Injunction, such that counsel's pre-Injunction efforts are not compensable. The Court therefore will not compensate BI for its efforts to police BOT's behavior prior to July 15, 2016, but only for work between July 16, 2017 through June 14, 2017, when the Court found BOT in contempt of court. The excision of all pre-July 16, 2017 time entries substantially reduces the scope of BI's fee request.

Second, upon careful review of the time records submitted by BI's counsel, the Court found numerous instances in which lead counsel at Stearns Weaver, Alan H. Fein, Esq., engaged in block billing. To be sure, the Court has no doubt that Mr. Fein worked all the hours reported. And, in this most recent chapter of the BI/BOT litigation, the Court was again impressed by Mr. Fein's work (and that of his colleagues at Stearns Weaver and Clarick Gueron). BI's record of

results in this litigation is testament to its counsel's industry and effectiveness: Over a protracted period, BOT has been dilatory, evasive, and intransigent in refusing to conform its conduct to the dictates of the License Agreement and now the Court's Injunction. Establishing and reining in these violations has called upon BI counsels' talent and tenacity. BI nevertheless, in seeking a fee award, is obliged to be punctilious in accounting for its time. The block-billing deficiencies that the Court has found in BI's timekeeping records require reductions to BI's compensable hours.

Notably, this is not the first time the Court has drawn attention to such shortcomings. In its prior fees opinion in No. 14 Civ. 792 (PAE), the Court identified problematic time-keeping practices on the part of Mr. Fein, who logged the most hours and charged the highest hourly rate of BI's counsel. His time entries there, the Court found, not only reflected block billing; they were also often far too terse and inexact, and were almost always rounded to the nearest hour, reflecting an approach to billing that the Court found disquietingly casual. *See, e.g., Benihana Inc.*, 2016 WL 3647638, at *6. As a result, the Court reduced the compensable hours of Mr. Fein by 45%. To be sure, Mr. Fein reports that he consciously improved his time-entry habits in the wake of that June 29, 2016 opinion. *See* Fein Decl. ¶ 67 n.18. And the Court's review of Mr. Fein's time entries does reflect substantial improvement following that date. Mr. Fein's daily time entries are more detailed than before; they more consistently itemize, for example, multiple tasks he performed on a particular day; and they now report Mr. Fein's daily hours on this matter to the tenth of an hour rather than rounding. They are, in short, far more precise than they were previously.

Nevertheless, Mr. Fein's time entries during the compensable period quite often continue to take the form of block billing. They often combine several tasks over a high number of hours

11

in a single time entry, without specifying the amount of time worked on each task. For example, Mr. Fein's entry for January 9, 2017 reports seven hours worked on "review and revisions of motion for sanctions; editing and organization of exhibits; interoffice conferences, telephone conferences, e-mails regarding status and strategy." Fein Decl., Ex. A at 22. Such an entry makes it impossible for a client or a reviewing court to determine how much time was spent on each activity, or to assess whether the amount of time spent on each activity was reasonable or excessive. Similarly, as another example, Mr. Fein's time entries for March 15, 16, and 17, 2017, each for 3.4 hours, all bear exactly the same description: "revisions to answer and counterclaims; interoffice conferences, telephone conferences, emails regarding Hawaii enforcement issues in light of arbitration, including menus, signage." *Id.* at 26. Again, while the Court has no doubt that Mr. Fein recorded his hours in good faith, such patently problematic billing entries disable the Court from shifting the entirety of the hours worked on such days from BI to its litigation adversary.

Third, on its review of BI counsels' time entries, the Court finds other inefficiencies that merit a reduction from the requested fee award. Unsurprisingly given the representation (at least by the time of the contempt motion) by BI of two law firms, BI's counsels' time entries reveal some degree of duplicative work. The entries also reveal occasions in which multiple lawyers appear to have spent material time reviewing and revising letters and submissions to BOT's counsel or the Court and on interoffice and/or interfirm conferences, telephone conferences, and other meetings. To be sure, review by a second pair of eyes is assuredly merited—indeed, a best practice—for letters to an adversary or submissions to a court. But the Court's review suggests that, as to some such communications, numerous timekeepers billed BI for their review or for common discussions. Less significantly, it also appears to the Court that while most of the work

described in the time entries does indeed qualify as performed in the service of assuring BOT's compliance with the Injunction, some does not. Stearns Weaver, for example, appears to seek to shift to BOT some of the time BI spent in the days immediately following entry of the Injunction analyzing the Court's July 15, 2016 ruling. While some such efforts—such as putting a monitoring and enforcement mechanism in place, as reflected in some time entries—are proper subjects for fee-shifting given BOT's ensuing breaches, BI counsels' internal discussions regarding post-opinion "litigation strategy," are not. *See, e.g., id.* at 12 (July 18, 2016 time entry for 2.3 hours submitted by Ms. Reed described as "attend litigation strategy meetings to discuss the impact of the opinion and next steps"). The Court is also mindful that, although it found BOT broadly non-compliant with the Injunction, as to certain particulars covered by BI's correspondence, no such finding was made. To a small degree, it is appropriate to prune BI's fee request to assure that the hours being compensated are synchronous with the areas in which BOT has been found in violation of the Injunction. The Court does not, however, share BOT's critique that BI's hours worked are unacceptably partner-intensive. The history of this controversy, including the nature of the parties' correspondence, amplify justifies the hands-on involvement of senior personnel at BI's law firms, in particular, Mr. Fein, whose grasp of the parties' barnacled prior history and of the present-day facts is unmatched.

In light of these deficiencies, the Court therefore imposes, as in its prior fees decision, an across-the-board reduction in the compensable hours for BI's timekeepers. This approach is more practical than making a time-entry-by-time-entry assessment, an exercise that would be both cumbersome and an exercise in false precision.

After close attention to the assembled time entries, the Court's judgment is to reduce the hours expended by all timekeepers at either firm—except Mr. Fein—during the period of July

16, 2016 through June 14, 2017 by 15%. As to Mr. Fein, the Court's judgment is to reduce the hours expended during this time period by 30%. This reduction is less than the one for Mr. Fein in the Court's prior fees decision, reflecting the greater specification in Mr. Fein's more recent time entries as to the nature of the tasks performed. The Court's reductions are consonant with those made by courts in this District confronting similar circumstances, including block billing. *See Beastie Boys*, 112 F. Supp. 3d at 57 ("Fee reductions around 30% are . . . common in this District to reflect considerations of whether work performed was necessary, leanly staffed, or properly billed.") (collecting cases).

Computing these reductions leads to a revised fees award of $600,806.72 for the hours worked by Stearns Weaver and an award of $12,404.47 for the hours worked by Clarick Gueron.

Finally, as to costs, BI requests $21,468.85 in costs during the relevant time period, mainly constituting its investigative costs, transcript fees, and travel costs for a settlement meeting held following the entry of the Injunction and for travel to the hearings on June 6 and 14, 2017. The Court finds these expenditures all reasonable. BI's efforts to investigate and monitor BOT's compliance with the Injunction, such as through sending professional investigators to the Benihana restaurant in Honolulu to examine its signage and menus, or to reach a settlement with BOT before seeking a judicial finding of contempt, were reasonable means of seeking to obtain compliance with the Injunction. And Mr. Fein, whose word to this Court is good, has sworn, under penalty of perjury, to the accuracy of these expenditures. *See* Fein Decl., ¶¶ 67–68 & Ex. B. As such, these expenditures have been sufficiently substantiated to be compensable. The Court therefore awards BI $21,468.85 in costs.

## CONCLUSION

For the foregoing reasons, the Court awards Benihana, Inc. reasonable attorneys' fees and costs, in the total amount of $634,680.04, representing $613,211.19 in attorneys' fees and $21,468.85 in costs.

The Clerk of Court is respectfully directed to enter a judgment.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: December 22, 2017
       New York, New York